# EXHIBIT 3

**U.S. CHAMBER**
**Institute for Legal Reform**



# The Food Court

*Trends in Food and Beverage*
*Class Action Litigation*

···················

**FEBRUARY 2017**




© U.S. Chamber Institute for Legal Reform, February 2017. All rights reserved.

This publication, or part thereof, may not be reproduced in any form without the written permission of the U.S. Chamber Institute for Legal Reform. Forward requests for permission to reprint to: Reprint Permission Office, U.S. Chamber Institute for Legal Reform, 1615 H Street, N.W., Washington, D.C. 20062-2000 (202.463.5724).

# Table of Contents

Executive Summary .................................................................................... 1

The Surge of Food Class Actions ........................................................... 5

Litigation Theories and Trends ................................................................ 17

Impact of Recent Appellate Decisions ................................................... 33

Settlements Primarily Benefit Lawyers, Not Consumers ................... 38

Recommendations ....................................................................................... 46

Prepared for the U.S. Chamber Institute for Legal Reform by

Cary Silverman and James Muehlberger, Shook, Hardy & Bacon L.L.P.

# Executive Summary

If you eat, then you are probably a member of a class action. In fact, it is likely that without your knowledge, plaintiffs' lawyers have told courts that they represent you in dozens of lawsuits. A close review of the litigation makes clear that the vast majority of these class actions result from lawyers shopping for cases, not consumer fraud.

About five years ago, a small cadre of class action lawyers turned its attention to food manufacturers. The attorneys found that terms used in food labeling, such as "natural," the packaging of products, and advertising opened the door to bringing lawsuits on behalf of consumers. These lawyers have argued that they do not need to show that consumers saw, heard, or relied on the labeling or advertising at issue when deciding to purchase the product, but only that consumers might be misled.

The theories of litigation are shifting, but the torrent of lawsuits has only grown stronger. There are now hundreds of active food class actions in the federal courts and more in state courts. A few are so laughable that courts have quickly thrown them out. Some are withdrawn or dismissed, typically as a result of a private settlement. Many more are litigated for years. Several of these lawsuits have reached multimillion dollar settlements that line the pockets of lawyers, but provide little or no benefit to consumers.

The following sections present this report's key findings on lawsuits targeting food and beverage marketing based on an in-depth review of court records, docket monitoring services, legal publications, and other sources.

## The Surge in Litigation

- Food marketing class actions increased from about 20 in 2008 to over 425 active cases in federal courts in 2015 and 2016.

- About 120 new food class actions were filed in or removed to federal court in 2015. Filings increased in 2016, with over 170 new food class actions filed in or removed to federal court.

- State courts host many additional lawsuits, some of which plaintiffs' attorneys have drafted to avoid removal to federal court under the Class Action Fairness Act.

## The "Food Courts"

- Three-quarters of food class actions in federal courts are in four states: California (36%), New York (22%), Florida (12%), and Illinois (7%). Another 10% of cases are spread among federal courts in Missouri, New Jersey, and Pennsylvania. Plaintiffs' lawyers file very few food class actions in other jurisdictions.

- The Northern District of California remains the most popular jurisdiction for food class actions, but the Eastern and Southern Districts of New York are experiencing a surge.

- Some local jurisdictions, such as certain areas of California and St. Louis, Missouri, are also hot spots for food litigation.

- A relatively small number of law firms file most food marketing class actions. Some firms specialize in particular types of claims, cut-and-paste complaints, and recycle the same individuals as class representatives.

- While many major food companies are defendants in these class actions, plaintiffs' lawyers are also suing family-owned businesses and small employers.

## Litigation Targets & Theories

- Claims challenging products advertised as "natural" remain most frequent, and have expanded to include lawsuits targeting similar representations such as "nothing artificial" or "preservative free." The U.S. Food and Drug Administration's (FDA) active consideration of the use of the term "natural" on food labeling has led some courts to place such lawsuits on hold.

- Food class actions are increasingly targeting products marketed as healthy or instances where images on the package, such as fruits and vegetables, could purportedly mislead a consumer to believe the product is healthier than it is.

- "Slack fill" litigation, which challenges unneeded extra space in product packaging, is on the rise. Plaintiffs' lawyers filed 10 slack fill cases in 2013 and 2014. During 2015 and 2016, they filed over 65 new slack fill class actions targeting food and beverages. Key courts have thrown out some of the most questionable cases, including claims alleging Starbucks' iced coffee deceptively includes ice that reduces the amount of coffee. Some slack fill lawsuits, however, have settled for significant sums.

- Plaintiffs' lawyers filed over 50 class actions against retailers that sell "100% grated Parmesan cheese" in 2016, the largest single surge of food class actions to date. The lawsuits allege that the presence of a small amount of an FDA-approved food additive that keeps cheese from clumping renders the product not 100% cheese.

- There was a recent uptick in claims against liquor makers, alleging products such as bourbon and whiskey are not "handmade," and against brewers alleging consumers may believe that the beer is made in small, craft breweries. Courts have largely dismissed these claims, though some remain pending.

- Some class action lawyers are targeting products that contain partially hydrogenated oils (PHOs), known as trans fats. Courts have found that federal law preempts lawsuits that conflict with FDA regulations that require products with a nominal amount of PHOs to be labeled 0% trans fat. But the FDA's recent policy phasing out trans fats has led to another flurry of lawsuits, even though the agency has given manufacturers until 2018 to change their products.

- Plaintiffs' lawyers are increasingly testing products, or relying on testing conducted by others, to allege that food products include trace amounts of substances that render the product's labeling inaccurate or misleading. Such complaints often lack the detail needed to determine the accuracy of the testing method.

- Plaintiffs' lawyers and advocacy groups may focus future lawsuits on food makers that highlight positive aspects of products containing added sugar. Already, a firm has filed a series of lawsuits targeting numerous breakfast cereals. These lawsuits allege that consumers would be misled to believe cereals such as Cocoa Puffs and Lucky Charms are healthy simply because they are labeled as containing whole grain.

- Courts are reluctant to promptly dismiss all but the most ridiculous or deficient of complaints. A few district court judges in key jurisdictions, however, have dismissed food class actions, finding the allegations made are contrary to common sense.

# Ninth Circuit Weighs In

- Food class actions are now reaching the appellate level, but the mixed results are not likely to slow the litigation machine. Four recent Ninth Circuit rulings will impact future food litigation:

  - In placing a hold on "natural" litigation while the FDA considers use of the term in advertising, *Kane v. Chobani* may reduce the plaintiffs' bar's enthusiasm for such suits.

  - *Ebner v. Fresh* could temper slack fill claims targeting food and beverages, particularly products in ordinary packaging.

  - The non-precedential ruling in *Brazil v. Dole* could spur more "all natural" suits, but also highlights challenges plaintiffs' lawyers face in satisfying class certification standards.

  - *Briseno v. ConAgra Foods'* rejection of a "standalone" ascertainability requirement will make district courts within the Ninth Circuit more attractive for filing food and other consumer class actions.

## Settlements Primarily Benefit Lawyers, Not Consumers

- Upon receiving a letter from a plaintiffs' lawyer threatening to file a lawsuit, some food and beverage makers settle cases they view as meritless to avoid litigation. After a lawsuit is filed, many cases are voluntarily dismissed, which typically indicates a private settlement under which the plaintiffs' lawyer and individual plaintiff get paid, but consumers receive nothing.

- In certified class actions, about half of the settlement money often goes to the lawyers who bring the case for their fees and costs, and to pay the cost of claims administration. While plaintiffs' lawyers receive millions in fees, consumers are usually eligible to seek a nominal cash payment, product vouchers, or products in the mail.

- Consumers, who often do not feel they were wronged, do not benefit from this system. Some consumers file claims or gladly accept free money or products. Ultimately, these litigation costs are reflected in the prices of products.

## Recommendations for Reform

- Courts, legislatures, and regulatory agencies all have a role to play in restoring commonsense to food class action litigation. This section provides concrete steps for the path forward.

# The Surge of Food Class Actions

In 2008, 19 consumer class actions were reportedly brought against food and beverage makers in federal courts.[1] That number reached 102 by 2012.[2] Some predicted that the food litigation wave would "peter out."[3] It has not.

A review of court dockets and other resources revealed 118 new class actions targeting the marketing of food and beverages filed in or removed to federal courts in 2015. The pace of filings continued to increase in 2016, with at least 171 more of these cases filed in or removed to federal courts. Overall, there were over 425 active food marketing class action lawsuits in the federal courts during this two-year period.[4]

These figures are just the tip of the iceberg. Many more cases are pending in state courts, for which it is not possible to get a precise count.[5] There are also numerous lawsuits that class action lawyers have threatened to bring by sending businesses a demand letter. Businesses sometimes choose to settle even before a lawsuit is filed. They know that the cost of seeking dismissal of a claim, which could cost $50,000 to $100,000, is far more expensive than the $10,000 to $25,000 that the lawyer would accept to make the lawsuit go away.[6]

## Targeted Products

Food class action litigation spans the gamut of products found in the supermarket, from jarred cucumbers to tater tots. Orange

> *Overall, there were over 425 active food marketing class action lawsuits in the federal courts during this two-year period.*

juice, cereal, frozen breakfast foods, instant oatmeal, pasta, Parmesan cheese, yogurt, soup, tuna fish, hummus, salad dressing, bread crumbs, olive oil, and iced tea are among the items on a very long list for plaintiffs' lawyers who are shopping for a class action. Snack foods, such as protein and granola bars, chips, and brownie mix, are particularly popular for lawsuits. And when lawyers check out at the supermarket, some head to the liquor store where they scan for products they think might lead a highly gullible consumer to believe a product is completely "handmade" or go to a coffee shop where they sue over the amount of ice in iced coffee.

The Food Court

# Common Claims

While the precise allegations in these lawsuits vary from case to case, claims generally fall in 10 categories (some lawsuits fall in more than one area). Several of these areas are explored in more depth in this report's discussion of litigation trends.

## NATURAL

Asserts that a product marketed as "natural," "nothing artificial," or "no preservatives" does not qualify for reasons such as the presence of genetically modified organisms (GMOs) or synthetic ingredients, or the product's processing. One such suit, for example, alleges that sour cream is deceptively advertised as natural because the cows that produce it are fed genetically-modified corn or soy.[7] These types of claims make up the largest share of the food class action docket.

## SLACK FILL

Claims a product's container, box, or other packaging includes extra space that might lead a consumer to believe he or she is getting more product than the package actually contains.

## ORIGIN

Claims representations on the package may confuse consumers as to where the product is made, such as by stating the product is "Made in the USA" when some ingredients may come from elsewhere, implying that beer is imported when it is made domestically, or labeling yogurt "Greek" when it is not actually from Greece.

## SPECIFIC HEALTH CLAIM

Asserts that representations on a product regarding its health benefits are overstated, lack support, or are offset by other factors.

## HEALTHY

Claims a product explicitly labeled "healthy" includes ingredients that are not sufficiently nutritious.

## LOOKS HEALTHY

Claims that consumers may believe a product is heathier than it is due to true statements that emphasize positive aspects of the product or images, such as fruits or vegetables, displayed on the product's packaging.

## EVAPORATED CANE JUICE

Targets products that distinguish between evaporated cane juice (ECJ) and processed white sugar on the ingredient list, asserting ECJ is misleading and should be replaced with "sugar."

## TRANS FAT

Asserts that any product that includes partially hydrogenated oils, even at nominal levels, violates consumer protection laws.

## PROCESSING

Challenges the labeling of a product as "handmade," or advertising that suggests a product is made in small batches or by a small business, when it is actually mass produced.

## OTHER REPRESENTATIONS

Challenges other representations on a product as potentially misleading or untrue. For example, the lawsuit may allege that cheese sold as 100% grated Parmesan is not actually 100% cheese because it includes an additive that stops it from clumping or that bread is not "baked in store" when it arrives frozen and is then baked.[8]

# Frequently Targeted Products

(Federal and Identified State Class Actions Active in 2015-16)



Juice/Juice Drinks 9%
Alcoholic Beverages 5%
Energy Drinks 4%
Coffee/Tea 4%
Soft Drinks 2%
Almond Milk 1%
Other Drinks 2%

Other Food 29%
Snack Food 22%
Cheese 11%

Infant Food 2%
Coconut Oil 2%
Yogurt 2%
Canned Tuna 2%
Cereal 3%

# Allegation In Lawsuit

(Federal and Identified State Class Actions Active in 2015-16)



Not Healthy As Labeled 2%
Not Healthy As Looks 3%
Challenges Specific Health Claim 5%
Evaporated Cane Juice Listed 6%
Contains Trans Fat 4%

Not Natural 31%
Slack Fill 12%
Other Representation Is Misleading 27%

Added Sugar 1%
Not Organic 1%
Testing-Based Claim 3%
Processing Method 2%
Origin Is Misleading 2%
Not Preservative Free 1%

## Food Courts: Three-Quarters of Food Class Actions Are in Federal Courts in Just Four States

As food litigation began to surge, the Northern District of California quickly gained a reputation as the nation's "food court."[9] A 2013 report from the U.S. Chamber Institute for Legal Reform estimated that, at that time, approximately 60% of food marketing class action lawsuits were filed in or removed to federal courts in California.[10] The Northern District, headquartered in San Francisco, hosted two-thirds of California's food litigation (and about one-third of food litigation nationwide).[11] By 2014, even judges within the Northern District acknowledged "the flood" of such cases inundating the court.[12]

Today, California's federal courts remain a hub of food litigation, but the state's share of the litigation has fallen to about 36% as plaintiffs' lawyers increasingly bring cases in other areas of the country. California's federal courts hosted approximately 150 active food class actions in 2015 and 2016. About 20% of all active food class actions in federal district courts nationwide are in the Northern District of California.

New York has emerged as a rival to California as a favorite jurisdiction for the food class action bar. Federal courts in New York now host over 20% of the nation's food litigation. The Eastern District of New York, in particular, has experienced a surge of lawsuits targeting food products over the past two years, and the Southern District of New York is not far behind. Other favorites of the class action bar include federal courts in Florida, particularly the Southern District, and Illinois, especially the Northern District.

# Food Class Actions Filed In Or Removed To Federal Court

(Active Cases 2015-16)



Taken together, U.S. district courts in California, New York, Florida, and Illinois host more than three-quarters of the food class action lawsuits in the federal court system.

There are also a significant number of food class actions pending in the U.S. District Courts for the Eastern District of Missouri, the Eastern and Western Districts of Pennsylvania, and the District of New Jersey.

> " *Taken together, U.S. district courts in California, New York, Florida, and Illinois host more than three-quarters of the food class action lawsuits in the federal court system.* "

Together, federal courts in these states account for about 10% of the federal total.

Plaintiffs' lawyers choose to file in these jurisdictions due to a combination of factors, such as a liability-friendly state consumer protection law or a perception that the district's judges are prone to certify class actions. Lawyers likely also file in these states because of their large populations, from which they can draw larger classes and settlements. These districts are often home to one or more plaintiffs' law firms that are members of the "food bar."

For example, in addition to its large size, California is an attractive state for filing food litigation because of its plaintiff-friendly consumer protection law, known as the Unfair Competition Law. Certain regions, such as the Bay Area, are perceived as having health-conscious, pro-plaintiff juries. California has also been plagued by inconsistent court rulings, some of which have given hope of success to plaintiffs' lawyers.

The recent surge of food class actions filed in federal courts in Brooklyn and Manhattan appears to result from a few plaintiffs' firms repeatedly filing such claims.

Florida, particularly South Florida, has an aggressive plaintiffs' bar.[14] Their successes, such as a $20 million settlement with Anheuser-Busch in 2015 ($3.5 million of which went to the lawyers),[15] have made the Sunshine State attractive for similar lawsuits.[16] The district court has also shown a willingness to entertain the most attenuated of cases. For example, the Southern District of Florida denied a motion to dismiss a claim against Chipotle Mexican Grill alleging that its products were not GMO-free as advertised, when animals used for its products had eaten genetically-modified feed.[17] The Northern District of California dismissed a similar lawsuit, finding that no reasonable consumer would interpret "non-GMO ingredients" in this manner.[18]

Illinois' federal courts may be viewed as hospitable to class actions due, in part, to a series of recent appellate decisions that sided with plaintiffs.[19] For example, after the U.S. Supreme Court vacated and remanded certification of a consumer class action alleging that front-loading washing machines were prone to develop mold, the Seventh Circuit reinstated its ruling affirming certification.[20] Although the defendants claimed the class was overbroad because most class members experienced no injury, the court brushed aside these arguments and the significance of the Supreme Court's tightening of class certification requirements.

New Jersey's Consumer Fraud Act (NJCFA) is considered "one of the most consumer-friendly" laws in the nation.[21] Under this law, courts must award triple damages and attorneys' fees for even minor, unintentional violations.[22] New Jersey also has among the longest statutes of limitations for consumer claims, six years,[23] which allows for larger class actions than most states.

Relatively few of these lawsuits seek certification of nationwide classes. Most allege claims under the consumer protection law of the state in which the lawsuit is filed. Some add classes of consumers from other states with plaintiff-friendly laws.

> **"** *Aside from federal courts in these states, what is extraordinary is the near absence of food class action lawsuits in most other jurisdictions, even when the same products are sold there.* **"**

Aside from federal courts in these states, what is extraordinary is the near absence of food class action lawsuits in most other jurisdictions, even when the same products are sold there. No other federal district court appears to have more than a handful of active class actions targeting food and beverage marketing practices.

The Class Action Fairness Act (CAFA) results in the transfer of many multistate class actions filed in state courts to the federal judiciary.  For this reason, this report focuses on cases in the federal court system, which can be more readily identified and reviewed. However, there are also many class actions pending in state courts. These lawsuits attempt to avoid federal jurisdiction by seeking less than $75,000 per plaintiff and no more than $5 million in the aggregate, which are the amounts necessary to trigger federal jurisdiction under CAFA.

The City of St. Louis Circuit Court in Missouri has become a particularly hot spot for food class actions. St. Louis has a reputation for "fast trials, favorable rulings, and big awards."[24] The Missouri Merchandising Practices Act (MMPA), under which these suits are brought, is known as a law that "invites potential abuses through socially valueless lawsuits and unnecessary

consumer litigation."[25] Over the past two years, a local attorney has alleged products ranging from candy to bread and cupcake mixes do not qualify as natural,[26] and combed the shelves for products that list "evaporated cane juice."[27] St. Louis may become even more attractive for these class actions after a state appellate court ruled that plaintiffs' lawyers can claim that consumers did not expect an ingredient to be contained in a product labeled "natural," even when it is clearly disclosed on the ingredient list.[28] Cole and Phelps counties also host food class actions, primarily slack fill claims, brought by a law firm based in Rolla, Missouri.[29]

## Rise of the Food MDL

For nearly 50 years, the United States Judicial Panel on Multidistrict Litigation, known informally as the "MDL Panel," has coordinated the federal judiciary's mass tort and other litigation, when multiple, similar cases are located in federal courts across the country. The cases are centralized for pretrial purposes before a single federal judge selected by the panel. Traditional examples of litigation transferred to MDLs include lawsuits resulting from airplane crashes, train wrecks, asbestos exposure, and product-related injuries or deaths. MDL treatment of food marketing class actions is a more recent, and increasingly common, addition.

There are currently 11 active MDLs addressing food marketing.[30] These dockets account for approximately one-third of the food class actions pending in the federal courts. They provide a representative assortment of the types of claims made in food class actions.

The largest and most recently established food MDL includes 49 class actions alleging cheese is not "100% Parmesan" because it includes a small amount of an ingredient that keeps cheese from clumping together.[31] Another recently established MDL includes cases asserting that containers of McCormick & Company's ground black pepper are under-filled.[32]

A dozen copycat class actions claim KIND LLC's snack bars are advertised as "all natural," "healthy," and as "a good source of fiber" with "no trans fats" when the products lack sufficient nutritional value, and contain saturated fat and genetically modified or synthetic ingredients.[33]

Whole Foods faces 11 class actions filed on behalf of shoppers who allege that its Greek yogurt contained more sugar than stated on the label. A federal judge overseeing the MDL dismissed the suits in February 2016, finding that the tests inappropriately relied solely on testing by *Consumer Reports*, rather than subjecting the yogurt to independent testing that met standards set by the FDA.[34] The dismissal granted the plaintiffs leave to amend their complaint, which they did the following month.[35]

> " *There are currently 11 active MDLs addressing food marketing. These dockets account for approximately one-third of the food class actions pending in the federal courts.* "

Other MDLs include class actions alleging that 5-Hour Energy does not actually provide a full five hours of energy, soft drinks include an artificial ingredient, and orange juice is not 100% pure because of how it is processed.[36] Finally, there are the infamous lawsuits alleging that some Subway "Footlong" sandwiches were less than 12 inches.

The latest absurd food class actions to be considered for MDL treatment are lawsuits alleging that Starbucks' hot beverages are under-filled and its cold beverages contain too much ice. In that instance, the Judicial Panel on Multidistrict Litigation denied a request to centralize litigation in August 2016.[37]

For purposes of the case filing statistics in this report, cases transferred to an MDL were recorded based on the federal court in which they were initially filed or removed.

| Active Federal Multidistrict Food Litigation[38] | MDL District | Docket No. | Established | Pending Class Actions (as of 1/17/17) |
|---|---|---|---|---|
| 100% Grated Parmesan Cheese Marketing & Sales Practices Litigation | N.D. Ill. | MDL-2705 | 6/2/16 | 49 |
| McCormick & Company, Inc., Pepper Products Marketing and Sales Practices Litigation | D.D.C. | MDL-2665 | 12/8/15 | 14 |
| KIND LLC "Healthy and All Natural" Litigation | S.D.N.Y. | MDL-2645 | 8/7/15 | 12 |
| Whole Foods Market, Inc., Greek Yogurt Marketing & Sales Practices Litigation | W.D. Tex. | MDL-2588 | 12/10/14 | 11 |
| Coca-Cola Products Marketing & Sales Practices Litigation (No. II) | N.D. Cal. | MDL-2555 | 8/7/14 | 6 |
| Subway Footlong Sandwich Marketing & Sales Practices Litigation | E.D. Wis. | MDL-2705 | 6/10/13 | 9 |
| 5-Hour Energy Marketing & Sales Practices Litigation | C.D. Cal. | MDL-2438 | 6/5/13 | 16 |
| Frito-Lay North America, Inc., "All Natural" Litigation | E.D.N.Y. | MDL-2413 | 12/12/12 | 11 |
| Simply Orange Orange Juice Marketing & Sales Practices Litigation | W.D. Mo. | MDL-2361 | 6/11/12 | 8 |
| Tropicana Orange Juice Marketing & Sales Practices Litigation | D.N.J. | MDL-2353 | 6/11/12 | 13 |
| Glaceau Vitaminwater Marketing & Sales Practice Litigation (No. II) | E.D.N.Y. | MDL-2215 | 2/8/11 | 2 |
| Total | | | | 151 |

## The Food Bar: Frequent Filers

A relatively small but growing cadre of lawyers generates most of the food class action lawsuits. These lawyers have effectively deputized themselves as the food police, searching supermarkets for product packaging that opens a company up to a lawsuit.

Some law firms are known for repeatedly bringing a particular type of claim, such as lawsuits targeting products advertised as "natural" or instances where a product's packaging appears to be able to accommodate more food (slack fill litigation).

For example, in a motion to dismiss a class action alleging that boxes of Sour Patch Kids Watermelon candy are under-filled, Mondelez International indicated that this lawsuit was, at the time, the latest of 14 cut-and-paste slack fill class actions filed by

> *These lawyers have effectively deputized themselves as the food police, searching supermarkets for product packaging that opens a company up to a lawsuit.*

Lee Litigation Group, PLLC.[39] In fact, the complaint targeting Sour Patch Kids sloppily contained references to "chewing gum" and "sugar-free gum,"[40] remnants from similar lawsuits filed by the firm.

Lawsuits filed by Steelman, Gaunt & Horsefield provide another example of the food litigation machine. On a single day,

October 25, 2016, the Missouri firm filed nine class action lawsuits alleging that boxes of various brands of fruit snacks, Reese's Pieces, Skittles, Junior Mints, Bit-O-Honey candy, and pancake and waffle mixes are under-filled.[41] Although brought against nine different businesses in "relentlessly pursuing justice"[42] for consumers, a substantial portion of each complaint is identical.

There is a sue first, ask questions later mentality, as U.S. District Court Judge Vince Chhabria recognized in deciding a case targeting Kraft's Capri Sun drinks. In that instance, Judge Chhabria stated during a hearing that Benjamin Lopatin of Eggnatz Lopatin & Pascucci, LLP, another frequent filer of food lawsuits, had "created a Rule 11 problem" in alleging that Capri Sun drinks were not "all natural" because they contain citric acid. "It seems you don't know if this is natural or not. You have no idea," Judge Chhabria observed. "It seems like you didn't do any investigation before filing the lawsuit."[43] Judge Chhabria dismissed the case.[44]

Some lawyers file copycat class actions. After a firm files a complaint in one of the key food court jurisdictions, lawyers in other areas file similar lawsuits on behalf of residents of their respective states.

The table below presents a snapshot of some of the frequent filers in each food court.

| Lawyer | Plaintiffs' Firm | Primary | Common Claims / Targets |
|---|---|---|---|
| Jack Fitzgerald<br>Trevor M. Flynn<br>Melanie Persinger | Law Office of Jack Fitzgerald PC | California | Healthy products, added sugar, trans fat content |
| Ben F. Pierce Gore | Pratt & Associates | California | Natural labels, specific health claims, evaporated cane juice |
| Scott A. Bursor<br>L. Timothy Fisher | Bursor & Fisher, P.A. | California<br>New York | Wide range of claims |
| Gregory S. Weston | The Weston Firm | California | Trans fat content |
| Abbas Kazerounian | Kazerouni Law Group, APC | California | Slack fill claims, product origin, alcoholic beverages |
| Joshua Harris Eggnatz<br>Benjamin M. Lopatin<br>Michael J. Pascucci | Eggnatz, Lopatin & Pascucci, LLP | Florida<br>California | Natural labels, juice blends, Parmesan cheese |
| Tim Howard | Howard & Associates, P.A. | Florida | Natural labels, juice blends, Parmesan cheese, alcoholic beverages |
| C.K. Lee<br>Anne Seelig | Lee Litigation Group, PLLC | New York | Natural labels, slack fill claims |
| Michael R. Reese | Reese LLP | New York | Natural labels, products that look healthy |
| Kim E. Richman | Richman Law Group | New York | Natural labels, products that look healthy, organic products |
| Matthew H. Armstrong | Armstrong Law Firm | Missouri<br>Illinois | Natural labels, evaporated cane juice, slack fill claims, Parmesan cheese |
| David L. Steelman<br>Stephen F. Gaunt<br>Patrick Horsefield | Steelman, Gaunt & Horsefield | Missouri | Slack fill claims |
| Thomas A. Zimmerman | Zimmerman Law Offices, P.C. | Illinois | Alcoholic beverages, products labeled as maple and brown sugar flavor, tuna can slack fill claims |

## The Class Representatives

Typically, lawyers who bring food class actions draft the complaints first, and only later find a client.[45] "The least likely way for a case to start is for a consumer to contact us out of the blue and say 'Hey we've been ripped off,'" noted a candid veteran class action lawyer.[46] It is not uncommon for the named plaintiffs in food class action lawsuits to be family members, employees, or others with close ties to the network of lawyers and law firms that file the complaints.[47]

For instance, Howard W. Rubinstein filed at least 100 class actions, including many involving food products, between 2000 and 2015[48] before he was suspended or disbarred from practice in courts in Texas and Florida.[49] He was the instigator of a lawsuit alleging consumers could be misled to believe "Crunch Berries" in Cap'n Crunch are actual fruit.[50] In his class action against 5-Hour Energy, it was discovered that the class representative, Vi Nguyen, was recruited to serve as a plaintiff by her cousin, who worked for a Texas lawyer Rubinstein knew. During a deposition, Nguyen admitted she had purchased two bottles of 5-Hour Energy specifically to sue the manufacturer, had never complained to the company nor sought a refund, and had signed a backdated retainer agreement the week before the deposition, months after she lent her name to the lawsuit.[51]

As Forbes columnist Daniel Fisher found, "E-mails and other communications 5-Hour's lawyers uncovered in their suit showed that Rubinstein belonged to a loose affiliation of lawyers who ran an assembly-line process of identifying companies to sue and then helping each other find plaintiffs."[52]

> *It is not uncommon for the named plaintiffs in food class action lawsuits to be family members, employees, or others with close ties to the network of lawyers and law firms that file the complaints.*

Some lawyers even develop lists of potential cases and then wait until they find a willing person in the right jurisdiction to file a lawsuit. For example, emails from lawyers in Rubenstein's firm disclosed in the 5-Hour Energy litigation include:

> *"Just found a San Fran client for this case. But, She bought it today for the first time if that matters."*

and

> *"I already have a complaint prepared for California based on the product not really being pomegranate juice. We just need a Cal client."*

As this type of correspondence shows, the food litigation is driven by lawyers as a money-making enterprise; it does not respond to consumer concerns.[53]

In fact, some class action law firms use the same people repeatedly as class representatives in consumer lawsuits against

> **"** *It appears that class action lawyers are increasingly pursuing smaller companies that can be pressured to pay a settlement.* **"**

different companies and products. Recent repeat plaintiffs for the food litigation bar include, for example, Troy Backus (CA),[54] Mario Aliano (IL),[55] Erika Thornton (MO),[56] Lois Bryant (MO),[57] Michelle Hu (NY),[58] and Adam and Barry Stoltz (NY).[59] When a case settles, class representatives typically receive an "incentive payment" in the $1,500 to $5,000 range.

In sum, class representatives are, at best, afterthoughts and, at worst, instruments of the food litigation machine.

## The Defendants: Big and Small Businesses

Nearly every major food and beverage manufacturer faces the types of class actions discussed in this report. However, one would be mistaken to believe that the surge of litigation merely targets companies viewed as having "deep pockets." The companies that are indiscriminately named in lawsuits that often allege trivial infractions include family-owned businesses and small startup companies. It appears that class action lawyers are increasingly pursuing smaller companies that can be pressured to pay a settlement.

Take, for example, three of the companies recently named in class actions filed in St. Louis alleging that product labels misled consumers by listing evaporated cane juice as an ingredient rather than sugar.

Dr. Laura Trice, a physician, probably never thought her Venice, California business, Laura's Wholesome Junk Food,[60] would be accused of misleading consumers about its products.[60] Her little operation, established in 2001, specializes in creating healthy snacks with minimal processing.[62] Dr. Trice not only lists the ingredients in her products on the company's website, but discusses why she chose each ingredient. She explains why she avoids using white sugar and instead sweetens her treats with dates, and, yes, "a small amount of evaporated sugar cane juice crystals." Evaporated cane juice, she notes "is sugar cane pressed and then left to crystallize with many of the nutritional benefits of molasses intact."[63] She even posted a YouTube video explaining the difference. But her small business now faces a lawsuit.

Taos Mountain Energy Foods was also hit with one of these lawsuits, stemming from its sale of organic snack bars.[65] Taos started out as a two-person operation in 2011, built up to 15 employees, and plans to create 15 more full-time jobs by 2020. It is based in the small historic village of Questa, New Mexico. Taos serves as the anchor tenant for a previously-vacant warehouse, helping revitalize Questa after a mine closed in 2014.[66]

EN-R-G Foods LLC was targeted due to its sale of Honey Stinger energy chews and protein bars.[67] The family-owned business, based in Steamboat Springs, Colorado, has its roots in a company founded by Ralph and Luella Gamber in 1946. It developed a honey-based energy bar as an alternative to candy bars in 1954. The couple's grandson, Bill Gamber, reestablished the company in 2002. Honey Stinger now has about 40 employees and has plans to continue to grow.[68] This past September, the company purchased a larger headquarters, opting to remain in Steamboat, a decision praised by business and community leaders as an economic win for the city.[69]

Each of these three companies—from California, New Mexico, and Colorado—finds itself enmeshed in class action litigation filed in the St. Louis Circuit Court.

The targeting of small businesses goes beyond cane juice lawsuits in Missouri. For instance, Lenny & Larry's, a business with about a dozen employees, was sued in Florida's Miami-Dade County.[70] The class action alleges that the company's protein-packed vegan cookies are not "all natural," and, while they are advertised as containing "no eggs, no dairy," there is a "cloud of doubt" as to whether they are actually vegan because, as the packaging notes, they are made in a facility that also processes meat and eggs.[71] The small Southern Californian company is an entrepreneurial success story, having been named to Inc. Magazine's list of fastest-growing private businesses in the country in 2012.[72]

It costs virtually nothing, aside from a nominal court fee, for a plaintiffs' lawyer to file a cut-and-paste complaint. But hiring a lawyer to defend against a lawsuit, and settle or dismiss it, can cause real pain for a small business, its employees, and its community.

# Litigation Theories and Trends

The theories asserted by plaintiffs' lawyers in food class action litigation are evolving. While once focused on whether a product qualifies as "natural," the litigation now has a far broader range. Does a product look healthier than it is? Can more of the product fit in the package? Does the product include any amount of trans fat? Is the product labeled "handmade" when machines play a role?
Can a test identify a trace amount of a substance that might suggest a product's labeling is inaccurate? When shopping for lawsuits, these are the latest questions on the class action lawyers' list.

## First Wave of Litigation

### ALL NATURAL CLAIMS

When litigation targeting food marketing took off, claims challenging products labeled "natural" or "all natural" were most common. Plaintiffs' lawyers find these claims particularly attractive because of the lack of a legal definition of what qualifies as natural, consumers' varied expectations, and how use of the term may vary for different types of products.[73]

These lawsuits often allege that the product includes an ingredient that could be viewed as synthetic. Other lawsuits claim that a product is not natural because it may contain a genetically-modified ingredient, such as corn or soy, even though the FDA has not recognized any meaningful difference between genetically-modified foods and foods developed by traditional breeding.[74]

Plaintiffs' lawyers even filed 30 class action lawsuits against orange juice makers, alleging that the products' processing renders them no longer "100% pure" or natural.[75]

Food makers respond that where consumers may differ on whether they consider an ingredient natural, they can make their own purchasing choices based on the ingredient list on the packaging. In addition, they note that reasonable consumers would expect the inclusion of some of the challenged ingredients. For

example, baking powder, a leavening agent, and thickening agents, such as xanthan gum and corn starch, serve functional purposes, such as making muffins rise.[76]

The FDA has struggled with the issue of what makes a product natural. The agency abandoned an attempt to regulate "natural" in the late 1980s and into the 1990s, citing resource constraints and other priorities.[77] The FDA's current policy leaves a large gray area. It simply states that the term "natural" with respect to food means "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected to be in the food."[78]

In 2013, two federal judges entered six-month stays and another judge administratively terminated claims alleging that manufacturers could not label products as natural when they contain genetically modified ingredients.[79] The judges invited the FDA to address the issue so that courts could make consistent rulings, but the FDA declined. An agency official responded in 2014 that taking such a position would require public notice and comment, input from other agencies, examination of science and technology, and consideration of consumer preferences.[80] She concluded that, due to limited resources and higher priorities, the FDA could not undertake such an effort.[81]

However, the following year, the agency did just that. In November 2015, the FDA, in response to four citizen petitions filed by industry associations, a food producer, and a consumer group, began accepting public comment on how it might define

"natural."[82] The comment period closed on May 10, 2016. The FDA is now considering thousands of submitted comments.

As a result of the FDA's active consideration of this issue, the Ninth Circuit stayed a "natural" case under the primary jurisdiction doctrine.[83] Federal district courts in California,[84] New York,[85] New Jersey,[86] and Missouri have followed this approach.[87]

In recent months, plaintiffs' lawyers appear to be filing fewer "natural" lawsuits relative to other types of allegations in food class actions, which have risen. While the FDA's past reluctance to weigh in fueled such lawsuits, its consideration of the issue now may have temporarily quelled them. Another possible reason for the declining use of this theory is that fewer manufacturers are using the term "natural" to avoid becoming an easy lawsuit target.[88]

## EVAPORATED CANE JUICE

Another early litigation theory that remains popular is that use of the term "evaporated cane juice" among a product's ingredients, rather than sugar, is misleading to consumers. Businesses use the term to refer to the presence of sweeteners derived from the fluid extract of sugar cane, which distinguishes it from white refined sugar. Plaintiffs' lawyers filed at least 50 ECJ lawsuits between 2012 and early 2014.[89] These class actions target products including yogurt, almond milk, pasta sauce, snack bars, juice drinks, pancake mix, and cookies that list ECJ among their ingredients.

In May 2016, the FDA dealt a blow to food makers, finding that describing sweeteners made from sugar cane on food labels as "evaporated cane juice" is false or misleading because it may suggest the sweetener is juice from a vegetable or fruit.[90] The FDA said manufacturers should instead refer to the ingredient as "sugar" or "cane sugar."

The FDA expressed its view in guidance to the industry that is not legally binding. The guidance has, however, armed plaintiffs' lawyers who have pending lawsuits and led companies defending such claims to settle. Manufacturers are also likely to quickly revise food labels to reduce the risk of liability.

Some courts had placed ECJ lawsuits on hold as the FDA considered the issue.[91] The FDA's guidance has revived them. Observers predicted that the guidance document would send plaintiffs' lawyers "scouring the shelves for products with 'evaporated cane juice' on the labels."[92] It has.[93] In fact, in just one week in November 2016, a lawyer filed a dozen cut-and-paste ECJ lawsuits in St. Louis, Missouri.[94]

## Current Targets and Theories

### THE NEW "ALL NATURAL": PRODUCTS LABELED "HEALTHY" OR THAT LOOK HEALTHY

The "natural" litigation is evolving. Recently filed class actions challenge products advertised as "nothing artificial," "no preservatives," or "nutritious" on grounds similar to "natural" claims. Like the "natural" lawsuits, plaintiffs' lawyers bringing the "not healthy" class actions assert for a number of reasons that a product does not meet these broad, undefined terms.[95]

Even when a product is not advertised as natural, healthy, or nutritious, lawsuits claim that images on the packaging or in advertising may mislead consumers to believe the product is more nutritious than it actually is. A classic example is the 2012 lawsuit against Nutella. That lawsuit was brought by a mother who alleged she was "shocked to learn" Nutella had nutritional value similar to a candy bar after she viewed TV ads.[96] In a commercial, a mother says that the hazelnut chocolate spread "is perfect on multi-grain toast and even whole-wheat waffles" and is a "great and easy way to give my family a breakfast they will want to eat."[97] The ad touted the product's use of "quality ingredients" like hazelnuts,

> *Even when a product is not advertised as natural, healthy, or nutritious, lawsuits claim that images on the packaging or in advertising may mislead consumers to believe the product is more nutritious than it actually is.*

skim milk, and a hint of cocoa, but did not mention the product's sugar and fat content.[98] A similar ad went slightly further, stating that moms can use Nutella "to get my kids to eat healthy foods" and that she "spreads a little on all kinds of healthy things."[99] Did such statements and images of a happy family truly lead any reasonable consumer to believe a chocolaty hazelnut spread is a health food?

The success of that lawsuit, which resulted in a significant settlement by a family-run business (see p.43), may have spurred more litigation challenging labeling or advertising that allegedly makes products look healthier than they are, even when the label fully discloses their ingredients. For instance, lawsuits filed in 2015 allege that images on the label of Gerber's "Puffs," marketed for toddlers, may lead shoppers to assume the product includes fruits and vegetables, even though the product is labeled a "cereal snack" and does not include any fruits or vegetables on the ingredient list. Two such cases were dismissed, with one judge stating simply that a "reasonable consumer should—well, read the label."[100]

Similarly, the Northern District of California dismissed a lawsuit targeting Plum Organics Mighty 4 puree pouches.[101] No reasonable consumer, the court found, would assume the size of ingredients pictured on the packaging correlates to their predominance in the blend of ingredients.[102] Any ambiguity could be resolved by reading the label, which lists ingredients in order of predominance, as required by the FDA.[103]

Class action lawyers continue to file comparable lawsuits. For example, an October 2016 lawsuit alleges that Naked juices are named after healthy foods like kale, include pictures of those ingredients on the label, and prominently state the products have "no sugar added" on the label when they have as much or more sugar than a soft drink.[104] The suit is baseless, PepsiCo says, noting that "[a]ny sugar present in Naked Juice products comes from the fruits and/or vegetables contained within and the sugar content is clearly reflected on label for all consumers to see."[105]

Companies cannot even sell a donut without lawyers claiming that consumers are so gullible they will believe there are health benefits in jelly-filled snacks. A lawsuit filed against Krispy Kreme in November 2016 alleges that the company's raspberry-filled pastries do not contain real raspberries, depriving donut-eaters of a "rich source of Vitamin C, Vitamin K, Potassium, and dietary fiber" and nutrients that "help fight against cancer, heart and circulatory disease, and age-related decline."[106] The lawsuit similarly alleges that the company's glazed blueberry donuts and donut holes do not contain real blueberries, robbing customers of nutrients with the "potential to limit the development and severity of certain cancers and vascular diseases, including atherosclerosis, ischemic stroke, and neurodegenerative diseases of aging."[107]

**WHAT IS HEALTHY?**

The FDA is currently considering how to define "healthy" for use on food labels. The FDA was prompted to open the matter, in part, by a citizen petition filed by KIND LLC.[108]  KIND had previously received a warning letter from the FDA regarding its use of the term on fruit and grain bars and faces ongoing class action litigation. The FDA has extended the deadline for filing public comments from January 26 to April 26, 2017.[109] The FDA's consideration of the issue could prompt manufacturers to ask courts to stay cases challenging foods labeled as healthy. A change in FDA policy could lead courts to dismiss cases or bolster pending lawsuits and fuel new litigation depending on whether a particular label is consistent with the FDA's view.

## NO SLACK FOR FOOD MAKERS

Class action lawyers are increasingly bringing claims alleging that a product's packaging misleads consumers to believe there is more product inside than the package actually contains. This type of lawsuit, based on empty space in a container, has become known as "slack fill" litigation. Food products are a primary target. Manufacturers of candy, tuna, pasta, ground black pepper, and other products face such lawsuits. These claims are literally consuming judicial time by fighting over such issues as how many Sour Patch Kid candies should fit in a box.[110]

Plaintiffs' lawyers filed 10 slack fill cases in 2013 and 2014, according to a consumer watchdog group.[111] That number has exploded, with at least 29 slack fill lawsuits filed in 2015 and 37 such claims filed in 2016. As discussed earlier, some firms are filing near carbon-copy complaints that appear to target any product that you can hear moving when the box is shaken. Slack fill claims now account for about 12% of food litigation. Products such as drugs, deodorant, lip balm, and laundry detergent are subject to similar lawsuits and are not included in this tally.

There are often functional reasons for packaging to contain extra room. Leaving space may protect the contents during transit or on the shelf, or be necessary for machines to properly seal the container. Space may also be the result of settling during shipment. Of course, a consumer can always read the number of ounces printed on the packaging to know the exact amount of product contained inside. However, none of these legitimate explanations have deterred some in the plaintiffs' bar from this new product packaging and labeling class action du jour.[112]

> " ...[S]ome firms are filing near carbon-copy complaints that appear to target any product that you can hear moving when the box is shaken. "

FDA regulations prohibit the use of "nonfunctional slack-fill," which is defined as empty space in the packaging that is not: (1) intended to protect the contents of the package, (2) required for the operation of the manufacturing process, (3) resultant from unavoidable product settling, (4) necessary for the proper preparation or consumption of the product, (5) dictated by labeling requirements or (6) required for the intended reuse of the packaging, such as in gift products.[113] California has its own statutory prohibition on nonfunctional space in food containers.[114] These laws have provided plaintiffs' lawyers with extra leverage to look for products in packages or containers that arguably include unnecessary space and bring a lawsuit.

Some courts have dismissed slack fill lawsuits, recognizing that reasonable consumers are not as easily misled as plaintiffs' lawyers claim. For example, in August 2015, the Northern District of California dismissed a class action alleging that Go-Pak containers of mini-Oreos and other Nabisco-brand cookies were not "adequately filled."[115] For these products, the packaging disclosed not only the net weight of the product, but also the exact number of cookies per container. Judge Richard Seeborg found that "[n]o reasonable consumer expects the overall size of the packaging to reflect precisely the quantity of product contained therein" and that any ambiguity can be resolved by reading the label.[116] "There is no deceptive act to be dispelled," the court concluded.[117]

In October 2016, the Eastern District of New York applied similar reasoning outside the food context to dismiss a claim targeting Advil.[118] Since the packages "clearly displayed the total pill-count on the label," it would be unreasonable, the court found, for consumers to have an expectation that the "entire volume of packaging would be filled to capacity with pills," as the complaint alleged.[119] "[I]t is not probable or even possible that Pfizer's packaging could have misled a reasonable consumer," Senior U.S. District Judge Sterling Johnson, Jr. concluded, finding the claim "does not pass the proverbial laugh test."[120]

The Oreo and Advil decisions, coming from two key food courts, suggest that the most spurious slack fill lawsuits will face significant challenges. They may spell trouble for a recent lawsuit filed against Kentucky Fried Chicken (KFC), for example. While not styled as a class action, a customer who purchased an eight-piece bucket of fried chicken and received an eight-piece bucket of fried chicken is seeking $20 million, claiming that the restaurant's advertising showed a bucket filled over the brim, when her bucket arrived half full.[121] KFC offered its dissatisfied customer coupons for $70 worth of free chicken. She returned them, hired a lawyer, and sued on "principle."[122]

While slack fill lawsuits may face challenges, some have resulted in lucrative settlements. For example, in September 2016, the Northern District of California gave final approval to a $12 million settlement between plaintiffs' lawyers and Starkist (see discussion of the settlement on p.40) to resolve allegations that five-ounce cans of tuna were under-filled.[123] Trader Joe's, Safeway, and others face similar lawsuits.[124]

> ❝ *In 2016, plaintiffs' lawyers filed more than 50 class action lawsuits in 10 states against companies that make and sell Parmesan cheese.* ❞

## VENTI LAWSUITS ON ICE

A recent flurry of lawsuits targeting Starbucks is an offshoot of slack fill litigation. Lawyers hit the coffee maker with at least four class actions between March and May 2016. Two claim that ice in Starbucks' cold drinks deprives consumers of part of their paid-for beverage.[125] Two others allege baristas leave too much empty space in hot coffee drinks.[126]

In August 2016, U.S. District Court Judge Percy Anderson of the Central District of California dismissed the iced beverage claims with a stern rebuke to the plaintiffs' lawyers: "If children have figured out that including ice in a cold beverage decreases the amount of liquid they will receive, the court has no difficulty concluding that a reasonable consumer would not be deceived into thinking that when they order an iced tea, that the drink they receive will include both ice and tea and that for a given size cup, some portion of the drink will be ice rather than whatever liquid beverage the consumer ordered," the court ruled.[127] In October 2016, a federal judge in Illinois similarly dismissed such a case. Judge Thomas M. Durkin found no misrepresentation. He noted that the drinks are listed on the menu as "iced" and the plaintiffs' contention that all of a 24-ounce drink's contents must be coffee "is simply not reasonable."[128]

The lawsuits claiming that Starbucks tricks consumers by not filling hot drinks to the brim continue. In June 2016, Judge Thelton E. Henderson of the U.S. District Court for the Northern District of California denied the coffee maker's motion to dismiss. The court found that the plaintiffs had presented sufficient allegations to proceed under California's consumer laws and that it is "plausible that a reasonable consumer could be misled" by representations on the size of the drink listed on the menu.[129] A similar class action, originally filed in New York, was transferred and combined with the California case in September 2016.[130]

## THE BIG CHEESE

In 2016, plaintiffs' lawyers filed more than 50 class action lawsuits in 10 states against companies that make and sell Parmesan cheese. This sudden surge of lawsuits was not the result of hundreds or thousands of consumers getting food poisoning due to Salmonella or Listeria contamination. It stems from plaintiffs' lawyers identifying deep pockets to sue—Kraft, Wal-Mart, Target, and major supermarkets. The lawsuits do not allege any physical injury. Rather, they claim that "100% Grated Parmesan Cheese" should be relabeled more precisely as, for example, "96.7% Grated Parmesan Cheese" because the products include an odorless, tasteless, safe, FDA-approved additive that makes it easier for consumers to sprinkle the cheese on food.

The additive is cellulose, an ingredient derived from plant matter, which plaintiffs' lawyers deride as "wood pulp." It is a commonly used anti-caking agent, meaning that it absorbs water and keeps shredded and grated cheeses from clumping in the jar or package. Its presence in the products is disclosed to consumers on the ingredient panel.

Grated cheeses and other products typically contain cellulose levels of 2% to 4%, which is viewed as an acceptable level.[131]  While testing has led to allegations that cellulose levels in some cheese products exceed this amount, some of the class actions target products within the acceptable range. Cheese sellers also question the reliability of these tests.

Most of the cheese class actions were brought in the usual jurisdictions, with two-thirds of the lawsuits filed in California, Florida, Illinois, and New York. In June 2016, the Judicial Panel on Multidistrict Litigation transferred the cases to the Northern District of Illinois, which will coordinate pre-trial rulings.[132] The "big cheese" appears to have quickly become the largest food marketing MDL in history.

## SPIRITS ARE DOWN: "HANDMADE" AND OTHER CLAIMS AGAINST ALCOHOLIC BEVERAGE MAKERS

Liquor makers are a relatively new, and, thus far, largely unsuccessful target for class action lawyers. Over the past two years, at least eight manufacturers of bourbon, whiskey, and vodka have been sued.[133] Beer brewers also face a range of allegations.

Lawsuits against distillers challenge their use of terms such as "handmade," "handcrafted," or "small batch" on product labeling and advertising. The days of making prohibition-era bathtub gin, thankfully, are largely over. Consumers understand that machinery plays a role in the distilling process. For these reasons, most courts have dismissed these lawsuits.

For example, in May 2015, U.S. District Judge Robert Hinkle of the Northern District of Florida dismissed a class action lawsuit against the manufacturer of Maker's Mark whiskey, which alleged that the product was not handmade as advertised. "[N]obody could believe a bourbon marketed this widely at this volume is made entirely or predominantly by hand," he ruled.[134] The court found that the plaintiffs had not articulated "a consistent, plausible explanation" of what they understood "handmade" to mean.[135] Obviously, the court observed, bourbon "cannot be grown in the wild," like coffee or orange juice. "[N]o reasonable person would understand 'handmade' in this context to mean literally made by hand" without use of substantial equipment, the court concluded.[136]

Perhaps even more trifling is a claim asserting that the maker of Tito's Handmade Vodka deceived the public by advertising its product as made in an "old fashioned pot still." There was no dispute that the vodka was made in a "pot" still, which is a method that has been used longer than a "column" still. But the plaintiffs asserted that the pot still used to make Tito's was too modern to qualify as "old fashioned." Judge Hinkle, who had earlier dismissed the plaintiffs' "handmade" claims, found the plaintiffs'

definition of "old fashioned" was too narrow. He compared pot stills to bound books and hard-copy newspapers, which "may be quite modern in some respects, but they still can be called 'old-fashioned.'"[137]

Beer makers are targeted in lawsuits that focus on whether the beer is made in a small brewery or mass produced. In June 2016, U.S. District Judge Gonzalo P. Curiel of the Southern District of California dismissed a class action filed against MillerCoors alleging that consumers might be misled by advertising to believe that its Blue Moon beer is made by an independent craft brewery. Judge Curiel found that the plaintiffs could point to no false or misleading statement made to support their claims and recognized that the Blue Moon product is prominently displayed on the MillerCoors website.[138]

Similarly, a class action in the Southern District of Florida against Anheuser-Busch alleged that the brewer tricks consumers into believing that Leffe "abbey ale" is actually brewed under the supervisions of Belgian monks in an abbey.[139] After that plaintiff dropped his claim for monetary damages, his lawyer argued that he has to show only that he was "angry or sad on grounds of perceived unfair treatment" to seek injunctive relief under Florida's Deceptive Trade Practices Act.[140] The case was voluntary dismissed by the parties in October 2016.

Anheuser-Busch has shown it will not be an easy target for plaintiffs' lawyers. It took an aggressive, public approach when fighting several class actions alleging that it "systematically waters down its products" in 2013.[141] National Public Radio investigated the claim itself and its requested test found no significant variation from the label.[142] Rather than settle the lawsuit, the brewer used it as an opportunity to spread word of the 71 million cans of drinking water it donates each year to the American Red Cross and disaster relief organizations worldwide.[143] The ad, showing a can of water and titled "They Must Have Tested One of These," ran in the New York Times and Houston Chronicle. A federal district court dismissed the lawsuits, finding that the alcohol content of the products varied less than 0.3%, an amount "not significant enough to be actionable."[144] As the Third Circuit found in affirming the trial court's ruling in 2016, such minor variations are legally permissible under federal labeling regulations that are followed by states.[145]

## CUTTING TRANS FAT LAWSUITS

For decades, food has included partially hydrogenated oils, also referred to as trans fats, and the FDA had recognized them as safe. In recent years, however, concerns have increased that they can contribute to cardiovascular disease. As a result, plaintiffs' lawyers have frequently targeted products that include PHOs, even at nominal levels. Examples of products named in recent lawsuits are coffee creamer, bread crumbs, taco shells and tortillas, cookies, soup, margarine, and mashed potatoes. Plaintiffs' lawyers have brought nearly all of these lawsuits in California.

An initial wave of lawsuits alleged that manufacturers misled consumers by labeling products "0g trans fat," even as federal regulations require such labeling when the product contained less than 0.5g trans fat per serving.[146]

The litigation expanded after the FDA signaled, in November 2013, that it was considering finding that there is no longer a consensus among qualified experts that PHOs should be "generally recognized as safe."[147] That step led manufacturers to begin reformulating their products and plaintiffs' lawyers to begin reformulating their lawsuits.

In June 2015, the FDA issued its final determination, requiring food makers to phase out artificial trans fat from food within three years.[148] Although the agency's action gave companies time to comply, the regulation did not expressly state that products with PHOs can be marketed lawfully until that time and that lawsuits asserting otherwise are preempted by federal law.

Some predicted that the FDA's banning of PHOs would be a "gift to the litigation industry."[149] Lawyers representing food makers commented that "[t]he class action lawyers have got their forks and knives out."[150] One frequent filer of food litigation, Michael Reese of Reese LLP, laid

> **Some predicted that the FDA's banning of PHOs would be a 'gift to the litigation industry.' Lawyers representing food makers commented that '[t]he class action lawyers have got their forks and knives out.'**

out the plaintiffs' bar's plan following the FDA's action: initially concentrate lawsuits on products that "have the aura of being healthy or are marketed to children," then move on to other targets.[151]

Indeed, class action lawyers immediately filed a new wave of class actions (and amended pending claims) alleging that products containing any amount of trans fat are inherently unsafe and violate consumer protection laws. For example, a lawsuit filed just two days after the FDA's action alleged that Heinz engaged in conduct that is "immoral, unethical, unscrupulous, and substantially injurious to consumers" under California law by including trans fats in its frozen French fries and tater tots.[152] Thus far, courts have generally found these claims preempted because the FDA's June 2015 action intended to avoid market disruption and provide businesses with time to identify suitable alternatives, and did not view PHOs as unsafe.[153]

Nevertheless, some law firms are repeatedly filing lawsuits attacking products with PHOs. The Weston Firm, through serial plaintiffs such as Victor Guttman and Troy Backus, has filed at least a dozen such lawsuits since 2015. In an August 2015 order, however, Judge William Alsup of the U.S. District Court for the Northern District of California found that "Guttman is not a typical consumer but is a self-appointed inspector general roving the aisles of our supermarkets."[154] Judge Alsup dismissed Guttman's lawsuit against a manufacturer of noodle products, recognizing that Guttman was certainly aware of the dangers of trans fats given his "five-year litigation campaign against artificial trans-fat and partially hydrogenated oil."[155]

The outcome of trans fat-related claims appears to vary based on the type of allegation involved. Federal courts have consistently dismissed "0% trans fats" labeling claims as preempted by the federal Nutrition Labeling and Education Act.[156] While plaintiffs' lawyers argue that federal labeling law applies only to the product's nutrition facts panel, courts have found the law extends to the packaging.

Claims that attempt to immediately ban products containing PHOs face both primary jurisdiction and preemption hurdles. Some judges have stayed these lawsuits since the FDA gave a three-year period for manufacturers to submit petitions requesting approval of specific uses of PHOs that pose no harm.[157] Judges in both the Northern and Southern Districts of California have alternatively dismissed these lawsuits as preempted, relying on an appropriation measure Congress enacted in late 2015 that precludes enforcement of the trans fat ban until the June 18, 2018, compliance date specified in the FDA's final determination.[158] In dismissing one such lawsuit, Judge John A. Houston found that this is "one of the frivolous lawsuits that Congress meant to preclude" when it passed the measure.[159]

Some claims, however, have survived motions to dismiss by arguing that consumers may be misled when a product that contains trans fat is explicitly marketed as "healthy."[160]

## CALIFORNIA'S "PROPOSITION 65" CLAIMS

In 1986, California voters approved a measure intended to promote safe drinking water, known as "Proposition 65."[161] Unfortunately, this unique law has morphed into a cash cow for private lawyers. They use a provision allowing any person to act as a private attorney general to file cut-and-paste lawsuits seeking civil penalties.

Prop 65 requires products to include a warning label when they include any of 800 substances identified under the California law as potentially carcinogenic. It does so even when the substance is present at common low levels that scientists view as perfectly safe. When testing reveals that a food or beverage product contains a trace amount of a listed substance, the lawyers sue.

A search of court dockets and other sources identified dozens of Prop 65 lawsuits filed over the past two years against food and beverage manufacturers in California state courts. A handful of law firms file most of the litigation, such as Yeroushalmi & Associates, Michael Freund & Associates, Aqua Terra Aeris Law Group, Pacific Justice Center, and Wraith Law. Common targets include nutritional supplements, seaweed products, cacao powder, and even coffee.

Prop 65 lawsuits have many similarities to the food class actions explored in this report. Prop 65 claims, however, are not class actions. For this reason, Prop 65 lawsuits are not included in this report's analysis of claims.

## DUBIOUS TESTING CLAIMS

Plaintiffs' firms, in an attempt to survive a motion to dismiss and begin discovery, are increasingly alleging independent product "testing" claims of dubious scientific and legal value.

Spurious testing claims allege "missing" ingredients, take issue with product quality, and claim the presence of off-label substances. These lawsuits often fail to specify the laboratory that did the testing or any details whatsoever concerning the methodology, statistical significance, or margin of error. Without such details, food makers and courts are unable to understand the reliability or rigors of testing, leaving them to ponder whether the testing could be problematic due to any number of biases or scientific errors.

Once the testing allegation is made, it can prove difficult to overcome despite this lack of detail. For example, in a case against Wal-Mart, the plaintiff claimed, after "rigorous scientific testing, including microscopic and chemical analysis," to have failed to find the presence of any pork in a can of Pork & Beans.[162] Wal-Mart pointed out that this was a "threadbare allegation," observing that the product's label explicitly stated that it contained "less than 2%" pork, and arguing that if the testing "was not sensitive enough to detect an ingredient that was less than 2% of a product, then the fact that their testing failed" has no significance.[163] The Central District of California, however, denied the motion to dismiss, stating that it was "unpersuaded" that "[p]laintiffs are required to plead specific details regarding the testing" of the product.[164]

Plaintiffs' lawyers have also invoked threadbare testing allegations to complain about the quality or contents of a product. For instance, in one recent case, the plaintiff purchased a variety of octopus products, supposedly hired a lab to perform DNA testing on the meat, and claimed the products "are actually jumbo squid and not octopus."[165] As has become standard practice, the plaintiff offered few details on the testing performed.

Other tests seek to identify the presence of substances not disclosed on the label. One large class of these cases looks for glyphosate, a common herbicide known as Roundup. For example, a class action alleges that "quantitative testing revealed that Quaker Oats contain glyphosate," continuing that "[d]iscovery of the true nature of the ingredients requires knowledge of chemistry and access to laboratory testing that is not available to the average reasonable consumer."[166] The complaint provided no other details about these tests. Quaker Oats responds that while farmers may add glyphosate during any part of the milling process, it thoroughly cleanses oats and any trace amounts of glyphosate that may remain are significantly below limits set by the Environmental Protection Agency.[167]

There are countless other examples, including everything from the supposed presence of arsenic in wine[168] and the anti-caking agent cellulose in a product labeled 100% Parmesan cheese[169] to residual traces of a pesticide in tea labeled as "natural."[170]

> ❝ *As claims based on testing continue to become a favorite tool of plaintiffs' firms, it is critical that courts enforce pleading standards to require complaints to provide sufficient detail of the testing method.* ❞

As discussed earlier, the Parmesan cheese cases are especially notable, as dozens of cases were consolidated in multidistrict litigation proceedings after a February 2016 *Bloomberg News* article reported that independent laboratory testing or other sources established the presence of cellulose in several brands.[171] Notably, the plaintiffs had not done the testing themselves, but rather relied on test results reported in the article. That article summarized the test findings, but did not explain the methodology, statistical significance, or margin of error.[172] In an e-mail to the *Bloomberg* reporter, Whole Foods insisted that there was no cellulose in its product, saying that the test—which showed 0.3% cellulose—could have been a false positive.[173]

It isn't uncommon for plaintiffs to rely on the media or other reports of supposed testing. As discussed earlier, plaintiffs' lawyers have claimed Whole Foods 365 Everyday Value Plain Greek Yogurt contained sugar content above the amount stated on the label "[a]ccording to six tests conducted by Consumer Reports magazine."[174] Nearly a dozen suits ensued, but the judge eventually dismissed the claims because the tests did not comply with FDA guidelines.[175]

The Federal Food, Drug, and Cosmetic Act and the Nutrition Labeling and Education Act expressly prohibit state-labeling requirements that are not identical to federal requirements, including requirements for the contents and nutrition information on product labels. The FDA regulates not only the information that must appear on the label, but also the methods by which it tests those labeling claims. The FDA has strict guidelines for random sampling and testing procedures, and by having such requirements the FDA protocol not only provides a standardized measure and lexicon, it also minimizes the likelihood that a different protocol will simply find (and report) a statistical outlier.

As claims based on testing continue to become a favorite tool of plaintiffs' firms, it is critical that courts enforce pleading standards to require complaints to provide sufficient detail of the testing method. Testing claims that do not conform to FDA standards should be dismissed as preempted by federal law. Otherwise, tests of no scientific or legal value will allow claims to pass the motion to dismiss stage and advance to highly-expensive and harassing discovery.

# Developing Litigation

## A BROAD ATTACK ON
## PRODUCTS WITH ADDED SUGAR

Those who bring and defend food litigation
expect a surge of lawsuits targeting
products marketed as nutritious or part of a
healthy diet but that contain added sugar.[176]

The first strike in this latest war on sugar
came in August 2016, when The Law
Office of Jack Fitzgerald filed class actions
asserting that "[e]xcessive consumption of
added sugar is toxic to the human body"
and accusing cereal makers of "leverag[ing]
a policy and practice of marketing high-
sugar cereals… with health and wellness
claims," despite sugar's detrimental effect
on health.[177] These lawsuits point the finger
at cereal makers for conditions including
obesity, diabetes, heart and liver disease,
hypertension, and even Alzheimer's,
dementia, and some cancers.

The three cut-and-paste lawsuits, filed
against General Mills, Kellogg, and Post
in the Northern District of California, each
includes an extensive list of cereal varieties,
breakfast and granola bars, and other
products.[178] For example, the lawsuit against
General Mills alleges that consumers would
be misled to believe Lucky Charms, which
is advertised as a "frosted toasted oat
cereal with marshmallows," and Cocoa
Puffs, marketed as "naturally and artificially
flavored frosted corn puffs," are healthy
because their packaging notes that the
cereals are made with whole grain.[179]

The lawsuits allege that under California's
Unfair Competition Law, the cereal makers'
marketing of products with added sugar
is likely to deceive consumers and is
"immoral, unethical, unscrupulous, or
substantially injurious to consumers."[180]
These lawsuits are an example of regulation
through litigation. If successful, the lawsuits
would require cereal makers to remove
truthful statements on products highlighting
positive health aspects. The lawsuits also
seek money—restitution for consumers and
payment of the lawyers' fees and expenses.

The Law Office of Jack Fitzgerald has
already expanded this assault beyond cereal.
For example, in October 2016, the firm filed
a similar lawsuit against Dole, targeting its
Fruit & Oatmeal and Parfait products.[181]

These class actions are more sophisticated,
but no less absurd than past lawsuits
against cereal makers, such as those
alleging consumers are misled to believe
that FrootLoops contain real fruit (dismissed
in 2007 and 2009)[182] and Cap'n Crunch's
Crunch Berries are real berries, providing
nutritional value (dismissed in 2009 and
2010).[183]

And only days into 2017, a health advocacy
group filed a lawsuit accusing Coca-Cola
and the American Beverage Association
of "engag[ing] in a pattern of deception to
mislead and confuse the public … about
the scientific consensus that consumption
of sugar-sweetened beverages is linked
to obesity, type 2 diabetes,[184] and
cardiovascular disease." The lawsuit,
filed in the Northern District of California,

attempts to use California's broad consumer protection law to require the defendants to change their marketing practices, disseminate research, and fund a public education campaign. While not a class action, the lawsuit was filed by some of the same attorneys who frequently file food class action litigation.[185]

## Common Sense Occassionally Prevails

While many of the allegations made in food class action lawsuits are ludicrous, judges are reluctant to dismiss food class actions as a matter of law,[186] even though they have the power to do so. When courts occasionally grant a motion to dismiss, they often give the plaintiffs multiple opportunities to amend their complaint to address the deficiency, prolonging the litigation and the cost for defendants. As a result, many of these lawsuits move into the costly discovery and class certification process.

When a court does dismiss a case, it makes headlines and is celebrated as an example of courageous judicial action. A few judges in key food courts, perhaps suffering indigestion from the number of class action lawsuits and their increasingly wild theories, have tossed cases. They have sometimes done so with colorful language as described in "The Commonsense Hall of Fame," next.

# THE COMMONSENSE HALL OF FAME

**Crunch Berries:** "[A] reasonable consumer would not be deceived into believing that the product in the instant case contained a fruit that does not exist." –E.D. Cal. 2009[87]

**Sugar in the Raw:** "[A] reasonable consumer could not be led to believe that Sugar in the Raw contains unprocessed and unrefined sugar." –S.D. Cal. 2012[88]

**"Natural" pasta:** "[T]he reasonable consumer is aware that Buitoni Pastas are not 'springing fully-formed from Ravioli trees and Tortellini bushes.'" –C.D. Cal. 2013[89]

**Soymilk not real milk:** "It is simply implausible that a reasonable consumer would mistake a product like soymilk or almond milk with dairy milk from a cow... Under the Plaintiffs' logic, a reasonable consumer might also believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper." –N.D. Cal. 2013[90]

**Fruit and vegetable images:** "The products … merely show pictures of featured ingredients contained in the puree pouch and fruit bars … [A]ny potential ambiguity could be resolved by the back panel of the products, which listed all ingredients in order of predominance, as required by the FDA and as reasonable consumers expect." –N.D. Cal. 2015[91]

**"Handmade" spirits:** "In [a] sense all bourbon is handmade; bourbon, unlike coffee or orange juice, cannot be grown in the wild." –N.D. Fla. 2015[92]

**Natural potato chips:** "The Merriam-Webster definition offered by plaintiff for the term 'natural' as 'existing or produced by nature: not artificial,' is not plausible because the chips are processed foods, which of course do not exist or occur in nature. Thus, no reasonable consumer could possibly believe that this definition could apply to the chips since they are a product manufactured in mass." –W.D. Mo. 2015[93]

**"Underfilled" iced drinks:** "[A]s young children learn, they can increase the amount of beverage they receive if they order 'no ice.' If children have figured out that including ice in a cold beverage decreases the amount of liquid they will receive, the Court has no difficulty concluding that a reasonable consumer would not be deceived into thinking … that for a given size cup, some portion of the drink will be ice rather than whatever liquid beverage the consumer ordered." –C.D. Cal. 2016[94]

**Inadequately filled mini-Oreos packs:** "[I]t is not plausible that 'a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled' into thinking the container would be packed to the brim with snack when the label accurately discloses the net weight of the product as well as the exact number of cookies per container." –N.D. Cal. 2016[95]

**Fruit-flavored cereal snacks do not contain fruit:** "Traversing the aisles of the modern grocery store can be a harrowing experience. Options abound. Between Brand A or Brand B, artificial or organic, sugar or sucralose, and so on, consumers must weigh their options and conclude which products befit their needs. To aid this process, federal law places certain requirements on the contents of labels affixed to the packaging of those food products. In turn, to understand what they are purchasing, reasonable consumers should—well, read the label." –S.D. Fla. 2016[96]

# Impact of Recent Appellate Decisions

Food class actions are slowly making their way through the judicial system. Only recently are cases reaching the appellate level. These cases present the opportunity for the judiciary to curb claims that go too far, but appellate decisions can also spark new waves of lawsuits. The latest rulings are a mixed bag for the future of food litigation.

Given the amount of food class action litigation pending in federal courts in California, Ninth Circuit rulings are especially significant in shaping the future of these cases. The Ninth Circuit recently provided guidance to lower courts in four significant decisions.

## Kane v. Chobani:
## A Stay on "All Natural" Class Actions Based on Primary Jurisdiction

In March 2016, the Ninth Circuit invoked the doctrine of primary jurisdiction to place a case on hold that challenged Chobani's use of "natural" and "evaporated cane juice" on the labeling of its Greek yogurts.[197] District Court Judge Lucy H. Koh had dismissed the lawsuit against Chobani in 2014.[198]

The primary jurisdiction doctrine allows courts to dismiss a complaint without prejudice or stay a lawsuit while regulators at a federal agency are considering an issue that impacts the litigation.[199]

In *Kane*, the plaintiff alleged that Chobani mislabeled its Greek yogurt by using the term "evaporated cane juice" rather than sugar, and by purporting to be "all natural" when the products contain color additives derived from "highly processed unnatural substances."[200]

In March 2014, the FDA reopened a comment period on when evaporated cane juice may be used as a term for sweetener. As the district court and Ninth Circuit considered the *Kane* case, the FDA continued to consider that issue. Similarly, as discussed earlier, in November 2015, the FDA requested comments on whether and when food makers may label their products as "natural."

The Ninth Circuit directed the district court to reinstate, but stay, the case until the FDA resolves the ECJ and "natural" proceedings.[201]

As a result of the *Kane* decision, several courts have stayed "all natural" food class actions. While the FDA issued non-binding guidance in May 2016 suggesting food makers not use the term "evaporated cane juice," the agency continues to consider use of "natural" to market food products.

## *Ebner v. Fresh:*
## The Reasonable Consumer Meets Slack Fill Litigation

One week before *Kane v. Chobani*, the Ninth Circuit ruled in a slack fill case that, while it did not involve food, may lead district courts to take a closer look at whether reasonable consumers would be misled by a product's packaging.

In *Ebner v. Fresh, Inc.*, the plaintiff claimed that the packaging of a lip balm product was deceptive because consumers could not access a portion of the product at its base.[202] The Ninth Circuit affirmed the district court's dismissal of the case. The appellate panel found that the design of the lip balm's case, which requires a portion to anchor the product, rendering it unusable, is "commonplace."

"Because of the widespread nature of this practice," the court found, "no reasonable consumer expects the weight or overall size of the packaging to reflect directly the quantity of product contained therein."[203] The court ruled that there was no deception as a matter of law.[204]

The Ninth Circuit's application of the reasonable consumer test to dismiss a slack fill claim as a matter of law could discourage meritless claims. Some district court judges have already relied on *Ebner* to dismiss claims in the food context.[205]

However, as some observers have pointed out, the court's reliance on ordinary, "commonplace" packaging leaves the door open for courts to distinguish the lip balm at issue from other products. It could also encourage lawsuits against manufacturers that package products in new and creative ways.[206]

## *Brazil v. Dole Packaged Foods:*
## Need to Show "Price Premium"

The Ninth Circuit's unpublished ruling on September 30, 2016, provides plaintiffs' lawyers with a victory in finding that a jury may conclude that reasonable consumers are misled when fruit is labeled "all natural" but contains synthetic citric and ascorbic acid.[207] But the Ninth Circuit also found the district court properly denied certification of a damages class, allowing plaintiffs to seek only injunctive relief.

In reversing the district court's grant of summary judgment to Dole, the Ninth Circuit relied on the FDA's informal 1993 guidance that states that foods are not "natural" if they include "artificial or synthetic" additives that "would not normally be expected to be in the food."[208] The court also noted several informal warning letters issued by the agency that informed companies that agency staff viewed "all natural" labels as deceptive

when the products contained synthetic citric acid.[209] "Taken together," the court found that a jury could find Dole's description of its products as "All Natural Fruit" is misleading to a reasonable consumer.[210]

While the Ninth Circuit's short, unpublished decision is not binding on district courts, this portion of the ruling is likely to keep similar claims, of which there are many, from early dismissal, and encourage more lawyers to search for products advertised as natural that contain citric acid.

The Ninth Circuit also summarily found the district court was within its discretion to decide the case even as the FDA considers whether to define how food sellers can appropriately use the word "natural."[211] In doing so, the *Brazil* panel reached a different outcome than the panel of the Ninth Circuit that decided *Kane v. Chobani*. This may prompt some courts to not stay litigation under the primary jurisdiction doctrine, or allow the litigation to proceed if significant time passes without FDA movement. At oral argument in *Brazil*, however, both parties asked the court not to stay the case, and the court may have simply followed the parties' wishes.[212]

While those elements of the decision may be favorable to class action lawyers, the ruling highlights challenges plaintiffs' face in obtaining certification of "all natural" class actions seeking monetary damages. The Ninth Circuit upheld the district court's decertification of a class seeking monetary damages. It found that the plaintiffs were not entitled to a full refund because the products were not valueless.[213] Yet, the plaintiffs did not explain how much of a

"price premium" consumers paid as a result of the product's marketing as "All Natural Fruit" and how this premium could be calculated with proof common to the class.[214] The Ninth Circuit remanded the case to the district court to allow Mr. Brazil to pursue injunctive relief for the class and restitution only for himself.[215] This aspect of the decision sends a cautionary signal to plaintiffs' lawyers to carefully develop their creative theories of damages with the aid of expert testimony.

## Briseno v. ConAgra Foods: No "Standalone" Ascertainablity Requirement

Plaintiffs' lawyers are applauding the Ninth Circuit's recent rejection of a "standalone" ascertainability requirement.[216] The ruling, if not reversed by the U.S. Supreme Court, will make certification of class actions easier for the many food class actions pending in federal courts in California and make the "food court" even more attractive for these claims.

Ascertainability is a challenge for plaintiffs bringing food class actions. It considers whether the class of consumers eligible to make a claim can be accurately identified. If it cannot, the litigation would compensate people who have never purchased a product with the labeling at issue, let alone have been misled by it.

Consumers are unlikely to keep receipts for low-cost products. As many of the food class action settlements show, courts have permitted distribution of settlement funds to consumers purely based on the

submission of a signed claim form stating that they purchased the product during a certain time period. Receipts are often not required unless the consumer claims he or she purchased a large quantity of the product. In some instances, consumers may have difficulty self-identifying whether they purchased a product with the label challenged in the lawsuit because the label changed over time or was sold in several forms of packaging.

On January 3, 2017, the Ninth Circuit ruled that ascertainability is not required for class certification. In *Briseno v. ConAgra Foods*, the plaintiffs claim ConAgra misleadingly labeled Wesson oil as "100% natural" when the product allegedly contains genetically modified ingredients. ConAgra responded that surveys of Wesson oil customers found that only 3% thought "all natural" meant non-GMO, making its representation not misleading to a substantial number of consumers as required for a claim.[217] The company argued that the lack of a plan for identifying class members precluded class certification.[218] Nevertheless, the U.S. District Court for the Central District of California certified classes of consumers from 11 states.[219]

The Ninth Circuit affirmed, finding that the federal rule governing class certification, Rule 23, does not impose a "standalone" or "freestanding" administrative feasibility requirement.[220] Rather, the court found that such concerns could be addressed through evaluating whether a class action

> **"** *On January 3, 2017, the Ninth Circuit ruled that ascertainability is not required for class certification.* **"**

is "superior to other available methods for fairly and efficiently adjudicating the controversy," including "the likely difficulties in managing a class action."[221] The court was not persuaded by concerns that, without the ability to accurately identify those who purchased the product, some individuals with legitimate claims would not receive notice of the class action while others who did not purchase the product could submit fraudulent claims. In reaching this outcome, the Ninth Circuit joined the Sixth, Seventh, and Eighth Circuits, and declined to join the reasoning of the Third Circuit and some district courts.[222]

Two other appeals pending before the Ninth Circuit give the court an opportunity to apply its ruling in *Briseno* to more complicated scenarios where consumers would have difficulty recalling whether they purchased the product at issue. The Ninth Circuit, in considering whether a class action is a superior method for resolving these cases, could find them inappropriate for certification.

> " *The court was not persuaded by concerns that, without the ability to accurately identify those who purchased the product, some individuals with legitimate claims would not receive notice of the class action while others who did not purchase the product could submit fraudulent claims.* "

In *Jones v. ConAgra Foods, Inc.*, the plaintiffs' claim Hunt's canned tomato products are not 100% natural because they contain citric acid or calcium chloride, PAM cooking spray is not 100% natural because it contains propellants, and Swiss Miss hot cocoa labeling is misleading in including antioxidant claims.[223] During the period at issue in the lawsuit, there were dozens of Hunt's tomato products, which came in different sizes and with varying ingredients and labeling, making it likely that many consumers did not purchase cans with the label at issue.[224] Some of the seven varieties of PAM were labeled "100% Natural," and others were not. Some of the hot cocoa was sold with and without a reference to antioxidants at the same time.[225] The district court found that consumers were not likely to be able to accurately self-identify whether they purchased a product with the allegedly misleading labeling. In July, the Ninth Circuit stayed the appeal in *Jones* to await a ruling in a U.S. Supreme Court case that will decide whether a circuit court has jurisdiction to review an order denying class certification after the named plaintiffs voluntarily dismiss their individual claims with prejudice, which also occurred in *Jones*.[226]

With *Jones* on hold, a Gerber case posing similar challenges has come to the forefront. In *Bruton v. Gerber Products Co.*, the plaintiffs allege that 69 baby food products, advertised with multiple labels, overstated the products' nutritional benefits by stating that they are an "excellent source" or "good source" of various vitamins and minerals.[227] The plaintiff also challenges the manufacturer's statements about sugar content. As in *Jones*, the district court found that the high number of products, multiple label iterations, and the fact that products with and without the challenged labels were available at the same time, precluded class certification.[228] In December 2016, the Ninth Circuit panel considering *Bruton* stayed the appeal pending the outcome in *Briseno*.[229]

# Settlements Primarily Benefit Lawyers, Not Consumers

When attempts to have a case dismissed or not certified as a class action fail, most food makers settle the lawsuit to avoid expensive litigation, the risk of an adverse ruling, and further harm to their brand. Many of these settlements essentially pay the lawyers to go away, providing little or no benefit to consumers. Some give consumers a small cash award or more of the same product that consumers purportedly were misled to purchase.

> *[C]lass action lawyers often threaten to bring a lawsuit by sending a business a demand letter. Businesses sometimes choose to settle to ward off an action being filed.*

Courts have repeatedly recognized that certification of a large class action places unwarranted pressure on defendants to settle even meritless cases.[230] The reason is simple. As the U.S. Supreme Court observed, "[W]hen damages allegedly owed to tens of thousands of potential claimants are aggregated and decided at once, the risk of an error will often become unacceptable. Faced with even a small chance of a devastating loss, defendants will be pressured into settling questionable claims."[231] When efforts to dismiss a food class action fail, and the court certifies a class, the usual next step is to settle.

## Nuisance Settlements

Many food and beverage makers, when threatened with a class action, agree to settle the case, even when the case is meritless. They settle for an amount that is under the lawsuit's nuisance value—the amount of money it will likely take to get the case dismissed.

### PRIVATE INDIVIDUAL SETTLEMENTS

Many nuisance settlements are never recorded. As noted earlier, class action lawyers often threaten to bring a lawsuit by sending a business a demand letter. Businesses sometimes choose to settle to

ward off an action being filed. They know that once the lawyer files a complaint, the company will need to hire counsel to file an answer and motion to dismiss, and its litigation expenses will begin to build.

Many food class actions that reach the court are dismissed before class certification. One study found that over one-third of class actions (which was not limited to food and beverage marketing claims) were voluntarily dismissed.[232] These cases are often dismissed "upon stipulation of the parties," which typically indicates that the plaintiffs' lawyer and the defendant reached an individual settlement. Under these private settlements, the plaintiffs' lawyer and the individual who brought the lawsuit will get paid, but class members receive nothing. In essence, defendants pay the plaintiffs' lawyers to stand down, which only encourages more lawsuits. Information about these settlements is not publicly available.

| "FOOTLONG" SETTLEMENT DOES NOT MEASURE UP FOR CONSUMERS | |
| --- | --- |
| Total Settlement | $525,000 |
| Plaintiffs' Lawyers: | $520,000 |
| 10 Class Representatives: | $500 each |
| Consumers: | $0 |

In early 2013, an Australian teenager in Perth posted a photo of a subway Footlong sandwich that measured 11 inches to the company's Facebook page.[233] It went viral.[234] As a result, class action lawsuits were filed not in Perth but a world away in New Jersey and several other states.

As any bread-baker understands, not every loaf will come out the precisely the same. Even today's standardization has its limits. But the lawsuits contended that consumers had been swindled out of about an inch of the product, worth about 40 to 60 cents of the $5 Footlong, by their measure.[235]

There are two major problems with this reasoning. The first is that every sandwich, regardless of the length of the bread, received the same amount of meat and cheese plus whatever toppings the customer chose. In fact, every sandwich was made out of the same amount of dough, but its shape was not always the same length.

Second, assuming there is normal variability in the length of a loaf of bread, in some cases, consumers may have received a loaf that was 12½ inches or 13 inches. Subway will of course not receive a credit in those instances.

By mid-2013, there were at least eight class action lawsuits attacking the Footlong sandwiches in many of the favorite jurisdictions for such lawsuits: California, Illinois, Pennsylvania, in addition to the New Jersey lawsuits. They sought recovery for consumers nationwide, covering anyone who purchased a Footlong sandwich from 2003 to 2015. These cases were transferred to the U.S. District Court for the Eastern District of Wisconsin in June of that year.[236]

During the two years of litigation, it became apparent that, in the words of Judge Lynn Adelman, who presided over the multi-district litigation, the plaintiffs' claims were "quite weak."[237] The "vast majority" of the bread sold in Subway stores was indeed

12 inches, and, when loaves were shorter, they were typically just a quarter-inch off as a result of natural variability in the shape of the bread, which did not affect the amount of food customers received.[238] Most consumers had suffered no injury. Many were perfectly happy with the sandwiches they received and, had they known the sandwiches might be slightly shorter than 12 inches, would have purchased them anyway.[239] In sum, the action did no more than allege a claim for wrongly-shaped bread.

Nevertheless, Subway decided to settle in the midst of the "media frenzy."[240] Under the agreement, which received final approval in February 2016, the handful of lawyers who brought the class actions would share $520,000 for their fees and costs.[241] The 10 class representatives, those named as plaintiffs, would receive $500 each for their involvement.[242] Consumers would not get a penny, leading a *Wall Street Journal* reporter to dub the settlement, "short on dough."[243] What they would receive is assurance that Subway would strengthen its quality control program, a pledge Subway had already made at the outset of the controversy.[244]

The settlement faces a challenge before the U.S. Court of Appeals for the Seventh Circuit, which held oral argument in September 2016.[245] The issue on appeal is whether it is appropriate for courts to certify classes for the purpose of approving "nuisance" settlements, which effectively pay off the lawyers to end a baseless lawsuit and provide no benefit to consumers. Judges on the panel reportedly were highly-skeptical of the no-injury, no-recovery-except-for-the-lawyers settlement.[246]

# Free Food & Drink Settlements

| COMPENSATION IN FISH | |
|---|---|
| **Total Settlement:** | **$12,000,000** |
| **Plaintiffs' Lawyers:** | **$3,600,000 fees $155,800 expenses** |
| **Class Representative:** | **$5,000** |
| **Consumers:** | **$4.43 in tuna vouchers or $1.97 cash per claim** |

"Give a man a fish, and you feed him for a day. Teach a man to fish, and you feed him for a lifetime." The origin of this oft-quoted saying is unknown, but following the *Hendricks v. StarKist Co.* settlement, it may be appropriate to add a line: "Bring a class action alleging a tuna can could have fit more fish, and you collect millions."

In 2013, class action lawyers accused StarKist of under-filling five-ounce tuna cans. StarKist denied the allegations, but agreed to settle the case after two years of litigation.

The $12 million settlement,[247] which gained final approval in September 2016,[248] provides that the company will pay $8 million in cash and give $4 million worth of vouchers to purchase StarKist-branded products. Anyone who purchased a can of StarKist tuna between February 2009 and October 2014 was eligible to file a claim. They did not need to show a receipt or otherwise prove that they purchased the product.

Ultimately, about one-third of consumers who filed a claim chose to receive payment in tuna vouchers. They will each receive $4.43 in vouchers per claim. The remaining 1.6 million class members will each receive a check for approximately $1.97 per claim.

Bursor & Fisher, which represented the class, sought $4 million in fees.[249] The court approved $3.6 million in compensation, representing 30% of the settlement fund. Presumably, the lawyers were not open to receiving their compensation in fish.

| FREE RED BULL FOR ALL | |
|---|---|
| Total Settlement: | $13,000,000 |
| Plaintiffs' Lawyers: | $3,380,000 fees $113,448 expenses |
| Class Representatives: | $5,000 each |
| Consumers: | Four-pack of Red Bull or $4.23 cash per claim |

Some defendants attempt to limit the damage that a lawsuit can do to a company's product and brand by offering consumers free products and donating unclaimed funds to a good cause.

Red Bull agreed to establish a $13 million fund to settle a 2013 class action alleging the slogan "Red Bull gives you wings" misled consumers to believe the products provided significant benefits over a cup of coffee or caffeine pill.[250] Anyone who had purchased the energy drinks in the previous 12 years was eligible to receive up to $10 cash (depending on the number of claimants) or two free Red Bull products valued at $15—no proof of purchase (or actual deception) required.[251]

As one observer noted, "Yesterday, the world received some truly wonderful news: A group of Red Bull customers took the company's 'It Gives You Wings' slogan a little too literally, sued the drink maker for false advertising, and forced Red Bull to give us all money. And the best part? Anyone who bought a Red Bull since 2002 was eligible to request a piece of the settlement–either $10 cash or $15 dollars in Red Bull products with no proof of purchase required. Isn't America great?"[252]

Ultimately, 40% of claimants took the free Red Bull. The rest received $4.23 in cash as the available funds were divided among those who filed claims.[253] The lawyers asked for $4.8 million in fees. The court approved an almost $3.4 million payment.[254] Red Bull's counsel said the company viewed this as a nuisance settlement with "a gift" to consumers.[255]

Some consumers clearly benefited from the settlement, though they did not feel cheated.  Law students celebrated on Facebook the arrival of their free four-packs of Red Bull just in time for finals in the spring semester of 2016.



## FROSTED MINI-WHEATS: MONEY FOR LAWYERS AND CHARITY

| | |
|---|---|
| Total Settlement: | $4,000,000 |
| Plaintiffs' Lawyers: | $1,000,000 |
| Claims Administration | $908,665 |
| Class Representatives: | $5,000 each |
| Consumers: | Approximately $12 each |

Kellogg agreed to settle a class action that claimed that the cereal maker falsely advertised Frosted Mini-Wheats as improving kids' attentiveness, memory, and other cognitive functions to a degree not supported by scientific evidence.[256] The agreement came under fire by the Ninth Circuit—first because of the extraordinary fee award to the attorneys; then because most of the settlement would have been through distribution of food to charities.

Consumers who purchased the cereal between January 2008 and October 2009 were eligible to file a claim regardless of their awareness of the allegedly misleading statement or whether increasing a kids' attentiveness was a factor for them in purchasing the cereal.[257] Under the proposed settlement agreement, consumers were eligible to receive $5 for each box of cereal purchased, up to $15.

In 2012, the U.S. Court of Appeals for the Ninth Circuit rejected the first settlement proposed in the case. The court found that the proposed $10.5 million settlement would provide the plaintiffs' lawyers with approximately $2 million in fees and costs, the equivalent of $2,100 per hour, while the settlement offered class members, at most, $15 from a $2.75 million fund.[258] "Not even the most highly sought after attorneys charge such rates to their clients," Judge Stephen S. Trott wrote for the unanimous panel.[259]

The court withdrew that opinion, removing most criticism of the attorneys' fees. Instead, the Ninth Circuit's reissued opinion focused on the inadequacy of the settlement due to its *cy pres* award, in which Kellogg would have distributed about half of the settlement value, $5.5 million in products, to food charities, a cause that had no connection to the alleged harm to consumers.[260]

On remand, the district court increased the consumer fund to $4 million, reduced the attorneys' fees to $1 million, set aside $908,665 for claims notice and administration costs, and allocated any unclaimed funds to consumer advocacy groups.[261]

In April 2016, class members reported receiving settlement checks for as much as $11.44 for cereal they bought eight years earlier.[262] As one class member wrote, "Got mine … going on a shopping spree to buy more Frosted Mini Wheats …"[263]

| KASHI SNACK BARS | |
| --- | --- |
| **Total Settlement:** | **$3,990,000** |
| **Plaintiffs' Lawyers:** | **$1,500,000 fees** **$168,204 expenses** |
| **Class Representatives:** | **$5,000 each** |
| **Consumers:** | **$0.55 per package** **up to $27.50 per household** |

In May 2012, Katrina Garcia and Laura Eggnatz filed a lawsuit against Kashi, alleging that the company falsely claim its granola, protein bars, and some of its cereals are advertised as "all natural" or containing "nothing artificial" when the products contain genetically modified soy, corn, or other ingredients.

The parties entered a proposed $3.99 million settlement in June 2015.[264] Under the agreement, consumers who purchased the products at issue between May 2008 and September 2015 (aside from in California, where there was a separate, similar class action) can file a claim to receive 55 cents per package purchased for up to 50 boxes for a maximum total recovery of $27.50 per household. No receipts are needed unless seeking more than this amount. Kashi also agreed to no longer advertise the products as natural.

The court gave final approval to the settlement in February 2016, which provides the attorneys involved with $1.5 million in fees and $168,204 in expenses—nearly as much as the amount set aside for consumers.[265] The two class representatives will each receive a $5,000 "service award."[266]

| NUTELLA: SWEET DEAL FOR PLAINTIFFS' LAWYERS | |
| --- | --- |
| **New Jersey Litigation** | |
| **Total Settlement:** | **$2,500,000** |
| **Plaintiffs' Lawyers:** | **$625,000 fees** **$500,000 fees for injunctive relief** **$80,000 costs** |
| **Claims Administration** | **$498,000** |
| **Class Representatives:** | **$2,000 each** |
| **Consumers:** | **$4 per jar up to $20** |
| **California Litigation** | |
| **Total Settlement:** | **$1,500,000** |
| **Plaintiffs' Lawyers:** | **$985,920 fees** **$27,504 costs** |
| **Class Representatives:** | **$10,000 and $7,500** |
| **Consumers:** | **$4 per jar up to $20** |

As discussed earlier, the maker of Nutella, Ferrero USA, was hit with class action lawsuits after consumers were "shocked" to learn that Nutella is not a health food. Despite the ridiculousness of this allegation, in 2012, the family-run business settled the litigation.[267] The primary beneficiaries of that deal were the lawyers.

There were two settlements; one settling two class actions brought and consolidated in New Jersey that brought claims on behalf of a nationwide class of consumers,[268] the other settling a class action brought in California and limited to California residents.[269]

The settlements were widely mocked. The *N.Y. Daily News* declared that the settlement brings "[b]ad news for people who thought they'd found their dream diet–Nutella is not a health food."[270] ABC News observed, "It's hard to imagine that there are people who might confuse Nutella—a gooey, chocolaty spread laden with sugar, palm oil and hazelnuts—with a health food. [But] now consumers can take their winnings, buy more Nutella, and know for sure they're not eating tofu."[271] Observers in other countries poked fun at the American judicial system. As the UK's *Daily Mail* headline read, "Spread the Wealth! Mum Win $3 Million in Class-Action Suit Over Nutella's 'Misleading' Health Claims."[272]

Under the initially proposed New Jersey settlement, Ferrero would have paid $5.5 million, but the attorneys asked the court to award $3.75 million in fees.[273]

After class members objected to the fee award, U.S. District Judge Freda L. Wolfson signed off on the new settlement. Under that agreement, Ferraro established a $2.5 million settlement fund. Before consumers received any benefit from that fund, $625,000 went for attorneys' fees, $80,000 went for class counsel costs, $498,000 went for the administrative expenses in managing the claims process, and $2,000 went to each of two class representatives—leaving just $1.3 million available for class members.[274] Class counsel also received an additional $500,000 award in relation to changes in labeling and advertising that the company agreed to make. Consumers could fill out a claim to receive $4 per jar of Nutella

they purchased, but no more than $20. The Third Circuit affirmed the court's order approving the settlement.[275]

Purportedly injured consumers fared no better under the California settlement. Of that $1.5 million settlement, plaintiffs' lawyers received $985,920, nearly two-thirds of the deal. Just $550,000 was earmarked for California consumers. The Ninth Circuit upheld the agreement, including the fee award, over class member objections.[276]

## Do Consumers Benefit?

If consumers felt that they were ripped off by a company, would they accept more of the same product as a remedy, as occurred in the Red Bull settlement? Do consumers realize that about half of the settlement money from these lawsuits often goes to the attorneys who brought the case for fees and costs, and for administering the claims payment process?

Class action lawsuits often drag on for years.[277] As noted earlier, about one-third of all class actions are voluntarily dismissed by the plaintiff. This often indicates that the parties have reached a private, individual settlement, meaning that the plaintiff and his or her attorney get paid to go away, but consumers receive nothing.[278] Another third of class actions are dismissed on the merits.[279] There is only about a one-in-three chance that a class action will lead to a classwide settlement, in which consumers will be eligible to obtain some form of compensation.[280] A decade may pass between when a consumer purchased the product and when he or she receives what is often a nominal payment.

> *"* *Even some plaintiffs' lawyers, who view class actions as valuable tools for fighting employment discrimination or other injustices, view food litigation as going too far.* *"*

Even some plaintiffs' lawyers, who view class actions as valuable tools for fighting employment discrimination or other injustices, view food litigation as going too far. For example, Adam Hoeflich, a professor at Northwestern University's Pritzker School of Law, has handled many class action lawsuits, but believes food labeling issues should be left to the FDA and Federal Trade Commission (FTC). "I believe strongly in the rights of consumers and appropriate food labeling," he said. "What I am skeptical of is that [class action litigation] is the appropriate mechanism to determine these issues."[281]

Others believe that where government agencies have left a regulatory gap or do not vigorously enforce the law, the class action bar should step in. For example, some observers, such as Michael Moss, an author and healthy-food advocate, hails regulation of the food industry through private lawsuits, rather than government agencies, as an achievement. "I love it that consumer agitation can cause companies to respond without government intervention," he said.[282] The flaw in this reasoning, however, is that, as this report shows, consumers are not driving these lawsuits. Lawyers are.

Class actions take an enormous toll on U.S. businesses, and ultimately on the public at large. While it takes minutes for plaintiffs' lawyers to cut-paste-and-file a complaint, the cost of defending against a "routine" class action typically costs a company between $1 million and $17.5 million dollars, and can run far higher.[283] In 2015 alone, businesses spent an estimated $525 million to defend themselves against consumer class actions.[284] Such costs ultimately result in higher prices for consumers.

# Recommendations

Lawsuits targeting food and beverage marketing are out of control. The limited segment of the plaintiffs' bar that brings these suits shows no signs of restraint. As a result, courts, legislatures, and regulatory agencies must respond to restore common sense to the litigation. Here are reasonable steps they can take.

## Judicial Action

Scattered throughout this report are examples of judges appropriately dismissing meritless food class actions, finding class certification inappropriate and scrutinizing settlements. These cases illustrate the types of actions courts can take to rein in food litigation.

1. Courts should carefully consider whether the named class representative and the consumers he or she purports to represent are actually misled by the labeling, packaging, or advertising at issue in the lawsuit.

   • Courts should adopt a presumption that consumers read labels when they might have a question about a product's ingredients or the amount contained in a package.

• Complaints filed by law firms with a history of cut-and-paste allegations or that are filed by serial plaintiffs deserve particularly close scrutiny.

• Courts ought to impose sanctions on lawyers that file complaints making truly ridiculous allegations, requiring them to pay attorneys' fees and costs.

2. Courts must require complaints to state a plausible claim and provide specific allegations when alleging fraud. For example, allegations that rely on product testing should describe the testing methods and results.

3. Courts should dismiss lawsuits alleging speculative or contrived losses, seeking full refunds when consumers ate and enjoyed the food, or claiming consumers paid more than the product was worth without supporting evidence.

4. Courts should deny class certification in cases where consumers have different motivations for purchasing food products and different priorities in selecting among products, it is not possible to ascertain class membership, and plaintiffs cannot establish injury on a classwide basis.

5. Courts need to closely examine class settlements and reject attorney fee awards that are disproportionate to the actual benefit to consumers.

6. Courts should look to regulations governing food and beverage marketing to provide consistency in litigation outcomes. Preemption, primary jurisdiction, and provisions of state consumer protection laws exempting conduct regulated or permitted by government agencies should all be closely considered.

## Legislative Action

Most class actions are brought in states known to have lawsuit-friendly consumer protection laws. Since many of these cases are removed to federal court, class certification is determined based on federal law.

7. State legislatures should amend consumer protection statutes to reinforce the need for each plaintiff to show actual injury, reliance, and out-of-pocket loss. They can also adopt provisions that recognize that conduct that complies with government regulations is not unfair or deceptive.

8. Congress should adopt class action litigation reforms that would:

- Ensure that class action litigation is driven by consumers, not lawyers, by requiring a plaintiffs' lawyer to disclose (1) any familial, employment, prior attorney-client, or other contractual relationship with the named plaintiff; (2) any prior class action filed by the named plaintiff; and (3) the circumstances under which each class representative or named plaintiff agreed to be included in the complaint.

- Prohibit certification of classes that include consumers who were not injured by the marketing or labeling at issue by requiring a class representative to "affirmatively demonstrates that each proposed class member suffered an injury of the same type and scope as the injury of the proposed class representative."

- Provide recovery to consumers who are actually injured by requiring a reliable and administratively feasible method of ascertaining those who purchased the product and experienced a loss before a class is certified.

- Tie attorney fee awards to the benefits actually received by the class. Prohibit fee awards under which lawyers receive more money than consumers.

- Provide all parties with a right to immediately appeal an order granting or denying class certification.

## Regulatory Agency Action

Plaintiffs' lawyers have exploited regulatory gaps, such as the lack of a definition of "natural." They have also seized on regulatory actions, such as the FDA's banning of trans fats to bring lawsuits, even though the agency provided a three-year phase-in period.

9. Federal agencies can weigh in where there is prolific litigation to provide uniform definitions of common labeling terms that close off litigation avenues and preempt lawsuits that make allegations that are inconsistent with federal law. Agency actions should be consistent with the First Amendment's protection of Commercial Speech.

# Endnotes

1   Jessica Dye, Food Companies Confront Spike in Consumer Fraud Lawsuits, Reuters, June 13, 2013 (citing data compiled by food litigation department of Perkins Coie).

2   *See id.*

3   *Id.*

4   Our counts of federal class actions include cases targeting food and beverage labeling or marketing filed in or removed to federal court in 2015 and 2016, or, if filed earlier, were actively litigated or settled during this two-year period. It does not include class actions stemming from contaminated food, worker classification suits, or anti-competition claims brought by other businesses. It also does not include scores of lawsuits brought under California's Proposition 65, which are typically brought as private attorney general actions, rather than class actions.

5   We identified 80 food class actions brought in state courts in 2015 and 2016 that were not, or had not yet been, removed to federal court, primarily in California and Missouri. This figure is likely a significant underestimate of the number of claims pending in state courts. Our compilation of class actions filed in state courts lawsuits is included in the report's statistics regarding the types of claims filed and targeted products.

6   *See* Elaine Watson, Food Litigation 101: Are You Up to Speed, Food Navigator-USA, Nov. 29, 2016 (citing the experience of attorneys at Perkins Coie and Venable).

7   *Newton v. Kraft Heinz Foods Co.*, No. 1:16-cv-04578 (E.D.N.Y. filed Aug. 17, 2016).

8   *See, e.g., Mladenov v. Acme Markets, Inc.*, No. 1:15-cv-00618 (D. N.J. filed Jan. 30, 2015); *Mladenov v. Wegman's Food Market, Inc.*, No. 1:15-cv-00373 (filed D. N.J. Jan. 20, 2015); *Mladenov v. Whole Foods Inc.*, No. 15-cv-0382 (D. N.J. filed Jan. 20, 2015). The court dismissed these cases on August 26,

2015, finding the plaintiffs had failed to provide enough detail to back their fraud claims and had not shown an ascertainable loss. *See Mladenov v. Whole Foods Inc.*, 124 F. Supp.3d 360 (D. N.J. 2015).

9   *See* Nicole E. Negowetti, Defining Natural Foods: The Search for a Natural Law, 26 Regent U.L.Rev. 329, 333 (2014).

10   *See* Cary Silverman, Food Class Action Litigation In The New Lawsuit Ecosystem: Trends, Targets and Players 91 (U.S. Inst. for Legal Reform, Oct. 2013).

11   *See id.* at 91-92.

12   *Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *1 (N.D. Cal. June 13, 2014).

13   For example, as discussed on p. 33, the Ninth Circuit's recent reversal of summary judgment in *Brazil v. Dole Packaged Foods, Inc.*, No. 14-17480, 2016 WL 5539863 (9th Cir. Sept. 30, 2016), may spur more "all natural" class actions, even as the court denied class certification.

14   Stephanie N. Grimoldby, Why Is Miami a Hub for Deceptive Labeling Class Actions? Lawyer-Driven Litigation, 'Venue Shopping' Contribute to Rise in Suits, Fla. Rec., May 14, 2016.

15   *See* Alex Wolf, Anheuser-Busch Beck's Beer False Ad Suit All Bottled Up, Law 360, Oct. 21, 2015 (discussing settlement in *Marty v. Anheuser-Busch Cos. LLC*, No. 1:13-cv-23656 (S.D. Fla.) in which plaintiffs alleged that the manufacturer misled consumers to believe Beck's beer was a German import).

16   *See, e.g., Lorenzo v. MillerCoors LLC*, No. 1:16-cv-20851 (S.D. Fla. filed Mar. 8, 2016) (alleging that consumers are misled to believe Coors Light is brewed exclusively in the Rocky Mountains when it is brewed in locations throughout the United States).

17   Order on Defendant's Motion to Dismiss Complaint, *Reilly v. Chipotle Mexican Grill, Inc.*, No. 1:15-CV-23425 (S.D. Fla. Apr. 20, 2016).

18   *Gallagher v. Chipotle Mexican Grill, Inc.*, No. 15-cv-03952, 2016 WL 454083 (N.D. Cal. Feb. 5, 2016) (recognizing there was "no dispute that the meat and dairy ingredients used by Defendant are not themselves genetically engineered in any fashion.").

19   *See* Daniel Thies, Recent Developments in the Seventh Circuit's Class Action Jurisprudence: Not as Pro-Plaintiff as They First Appear, Federal Civil Practice, vol. 14, no. 3 (Ill. St. Bar Ass'n, Apr. 2016) (discussing implications of *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015); *Remijas v. Nieman Marcus Grp., LLC*, 794 F.3d 688 (7th Cir. 2015); *Champan v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015); *McMahon v. LVNV Funding, LLC*, 807 F.3d 872 (7th Cir. 2015); *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750 (7th Cir. 2014); *In re IKO Roofing Shingle Products Liab. Litig.*, 757 F.3d 599 (7th Cir. 2014).

20   *See Butler v. Sears, Roebuck & Co.*, 727 F.3d 796, 801 (7th Cir. 2013).

21   Joanna Shepherd, The Expansion of New Jersey's Consumer Fraud Act: Causes and Consequences 9 (Am. Tort Reform Found. 2014).

22   N.J. Stat. Ann. § 56:8-19 (requires judges to triple damage awards).

23   N.J. Stat. Ann. § 2A:14-1; *Kennedy v. Axa Equitable Life Ins., Co.*, No. 06-cv-6082, 2007 WL 2688881 (D. N.J. Sept. 11, 2007) (finding New Jersey's six-year statute of limitations applies to claims under the NJCFA).

24   Margaret Cronin Fisk, Welcome to St. Louis, the New Hot Spot for Litigation Tourists, Bloomberg Businessweek, Sept. 29, 2016.

25   *See* Joanna Shepherd, The Expanding Missouri Merchandizing Practices Act (Am. Tort Reform Found. 2015).

26   A sample of "all natural" lawsuits filed by Matthew H. Armstrong of the Armstrong Law Firm LLC includes: *Garner v. Bahlsen North America Inc.*, No. 1622-CC11327 (Cir. Ct., City of St. Louis, Mo., filed Nov. 17, 2016); *Kreider v. Dover Foods, Inc.*, No. 1622-CC10011 (Cir. Ct., City of St. Louis, Mo., filed Sept. 1, 2016); *Johnson v. Richardson Brands Co.*, No. 1622-CC00271 (Cir. Ct., City of St. Louis, Mo., filed Feb. 5, 2016); *Thornton v. Katz Gluten Free Bake Shoppe Inc.*, No. 1522-CC10713 (Cir. Ct., City of St. Louis, Mo., filed Sept. 25, 2015); *Zieroff v. New Hope Mills Mnf'g*, No. 1522-CC10185 (Cir. Ct., City of St. Louis, Mo., filed July 22, 2015); *Row v. Conifer Specialties Inc.*, No. 1522-CC09720 (Cir. Ct., City of St. Louis, Mo., filed May 21, 2015); *Teachout v. Am. Naturals Co. LLC*, No. 1522-CC00505, at 2 (Cir. Ct., City of St. Louis, Mo., filed Mar. 4, 2015); *Murphy v. Stonewall Kitchen, LLC*, No. 1522-CC00481 (Cir. Ct., City of St. Louis, Mo., filed Feb. 27, 2015).

27   *See infra* notes 89-94 and accompanying text.

28   *See Murphy v. Stonewall Kitchen, LLC*, No. ED 104072, 2016 WL 6596083, at *3 (Mo. Ct. App. Nov. 8, 2016) (reversing dismissal of claim alleging cupcake mix was not natural because it contained sodium acid pyrophosphate, a common leavening agent).

29   *See, e.g., Hawkins v. Nestle USA, Inc.*, No. 16PH-CV01725 (Mo. Cir. Ct., Phelps County, filed Nov. 18, 2016); *Trentham v. Continental Mills, Inc.*, No. 16PH-CV01563 (Mo. Cir. Ct., Phelps County, filed Oct. 25, 2016); *Skornia v. General Mills, Inc.*, No. 16AC-CC00452 (Mo. Cir. Ct., Cole County, filed Oct. 25, 2016); *Bratton v. The Hershey Co.*, No. 16AC-CC00451 (Mo. Cir. Ct., Cole County, filed Oct. 25, 2016); *Melton v. Kellogg Co.*, No. 16PH-CV01564 (Mo. Cir. Ct., Phelps County, filed Oct. 25, 2016); *Grisham v. The Kroger Co.*, No. 16PH-CV01562 (Mo. Cir. Ct., Phelps County, filed Oct. 25, 2016); *Skornia v. Mars, Inc.*, No. 16AC-CC00453 (Mo. Cir. Ct., Cole County, filed Oct. 25, 2016); *White v. Mott's LLP*, No. 16PH-CV01566 (Mo. Cir. Ct., Phelps County, filed Oct. 25, 2016); *Hawkins v. Pearson Candy Co.*, No. 16PH-CV01565 (Mo. Cir. Ct., Phelps County filed Oct. 25, 2016); *Bratton v. Tootsie Roll Indus., Inc.*, No. 16AC-CC00454, Mo. Cir. Ct., Cole County, filed Oct. 25, 2016).

30    *See* United States Judicial Panel on Multidistrict Litigation, MDL Statistics Report - Distribution of Pending MDL Dockets by District (Jan. 17, 2017).

31    *In re: 100% Grated Parmesan Cheese Mktg. and Sales Practices Litig.*, ___ F. Supp. 3d ___, 2016 WL 3190426 (J.P.M.L. June 2, 2016).

32    *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Practices Litig.*, 148 F. Supp. 3d 1364 (J.P.M.L. 2015).

33    *See In re: Kind LLC (All Nat.) Litig.*, 118 F. Supp. 3d 1380 (J.P.M.L. 2015).

34    *See* Order, *In re: Whole Foods Market, Inc., Greek Yogurt Marketing & Sales Prac. Litig.*, No. A-14-MC-2588-SS (MDL No. 2588) (W.D. Tex. Feb. 16, 2016).

35    Plaintiffs' Consolidated Third Amended Complaint, *In re: Whole Foods Market, Inc., Greek Yogurt Marketing & Sales Prac. Litig.*, No. A-14-MC-2588-SS (MDL No. 2588) (W.D. Tex. Filed Mar. 4, 2016).

36    There is an additional food marketing MDL that is listed as including 16 active cases on the docket, *In re Pom Wonderful LLC Marketing & Sales Practices Litig.*, No. 2:10-ml-02199 (C.D. Cal. established Dec. 21, 2010). This MDL, however, appears to be inactive and is not included in this report's statistics.

37    Order Denying Transfer, *In re Starbucks Corp. Marketing & Sales Practices Litig.*, MDL 2725 (J.P.M.L. Aug. 5, 2016).

38    *See* U.S. Judicial Panel on Multidistrict Litigation, MDL Statistics Report - Distribution of Pending MDL Dockets by District, Jan. 17, 2017.

39    *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Class Action Complaint, *Izquierdo v. Mondelez Int'l, Inc.*, No. 1:16-cv-04697 (E.D.N.Y. filed Aug. 29, 2016).

40    *See* Class Action Complaint, *Izquierdo v. Mondelez Int'l, Inc.*, No. 1:16-cv-04697, ¶¶ 29, 52 (E.D.N.Y. filed June 20, 2016).

41    *See supra* note 29.

42    Steelman, Gaunt & Horsefield, Class Actions, http://www.steelmanandgaunt.com/Practice-Areas/Class-Actions.shtml (last visited Nov. 2, 2016).

43    *See* Beth Winegarner, Judge Bashes Consumers' Atty in Kraft 'Natural' Capri Sun Suit, Law360, Oct. 15, 2015.

44    *See* Order on Motion to Dismiss, *Osborne v. Kraft Foods Group, Inc.*, No. 3:15-cv-02653 (N.D. Cal. Oct. 15, 2015). While the court gave the plaintiffs an opportunity to amend the complaint and re-file, they opted to voluntarily dismiss the case with prejudice. *See* Notice of Voluntary Dismissal, *Osborne*, No. 3:15-cv-02653 (Nov. 5, 2015) (Dkt. #30).

45    *See* Daniel Fisher, Collapse of 5-Hour Energy Case Reveals the Secrets of Class Action Lawyers, Forbes, Nov. 17, 2015.

46    *Id.* (quoting Kevin Roddy).

47    For example, in an "all natural" lawsuit against Kashi that recently settled, discussed *infra* at 264, one of the two class representatives is the wife of a prominent food class action lawyer.

48    *See* Fisher, *supra.*

49    *See* In re: Report and Recommendation Regarding Howard W. Rubinstein of Ad Hoc Committee on Attorney Admissions, Peer Review and Attorney Grievance, Admin. Order No. 2015-69 (S.D. Fla. Oct. 13, 2015) (disbarring Mr. Rubenstein from practice before that court and noting similar action taken by District Court of Travis County, Texas on August 5, 2014).

50    Amended Order Granting Motion to Dismiss, *Werberl v. PepsiCo, Inc.*, No. 4:09-cv-04456, 2010 WL 2673860 (N.D. Cal. July 2, 2010).

51    *See* Fisher, *supra.*

52    *See id.*

53   *Id.* (quoting correspondence by lawyers in Rubenstein's firm revealed in the 5-Hour Energy lawsuit).

54   *See, e.g., Backus v. H.J. Heinz*, No. 3:15-cv-02738 (N.D. Cal. filed June 8, 2015); *Backus v. Biscomerica Corp.*, No. 3:16-cv-3916 (N.D. Cal. filed July 12, 2016); *Backus v. ConAgra Inc.*, No. 3:16-cv-454 (N.D. Cal. filed Jan. 26, 2016); *Backus v. General Mills Inc.*, No. 3:15-cv-1964 (N.D. Cal. filed Apr. 30, 2015); *Backus v. Nestle USA Inc.*, No. 3:15-cv-1963 (N.D. Cal. filed Apr. 30, 2015).

55   *See, e.g., Aliano v. The Quaker Oats Co.*, No. 1:16-cv-3087 (N.D. Ill. filed Mar. 10, 2016); *Aliano v. WhistlePig LLC*, No. 1:14-cv-10148 (N.D. Ill. removed from Cook County Cir. Ct. on Dec. 18, 2014); *Aliano v. Mom Brands Co. LLC*, No. 2016CH03879 (Ill. Cir. Ct., Cook County, filed Apr. 2016 ).

56   *See, e.g., Thornton v. Red Mill Farms LLC*, No. 1622-CC11274 (Cir. Ct., City of St. Louis, Mo., filed Nov. 14, 2016);*Thornton v. Pinnacle Foods Group LLC*, No. 4:16-cv-00158 (E.D. Mo. filed Feb. 5, 2016); *Thornton v. Katz Gluten Free Bake Shoppe Inc.*, No. 1522-CC10713 (Cir. Ct., City of St. Louis, Mo., filed Sept. 25, 2015); *Thornton v. YZ Enterprises, Inc.*, No. 1522-CC00482 (Cir. Ct., City of St. Louis, Mo., filed Feb. 27, 2016).

57   *See, e.g., Bryant v. Just Born, Inc.*, No. 1622-CC11494 (Cir. Ct., City of St. Louis, Mo., filed Dec. 8, 2016); *Bryant v. BB Holdings Inc.*, No. 1622-CC11280 (Cir. Ct., City of St. Louis, Mo., filed Nov. 14, 2016); *Bryant v. Whole Foods Market Group Inc.*, No. 4:15-cv-01001 (E.D. Mo. filed June 25, 2015).

58   *See, e.g., Hu v. Herr Foods Inc.*, No. 1:16-cv-03313 (E.D.N.Y., filed June 20, 2016); *Hu v. Perfetti Van Melle USA Inc.*, No. 1:15-cv-03742 (E.D.N.Y., filed June 26, 2015); *Hu v. The Hershey Co.*, No. 15-cv-3741(E.D.N.Y. filed June 26, 2015).

59   *See, e.g., Stoltz v. ConAgra Foods, Inc.*, No. 1:14-cv-05546 (E.D.N.Y. filed Sept. 22, 2014); *Stoltz v. Henkel Corp.*, No. 1:14-cv-05547 (E.D.N.Y., filed Sept. 22, 2014); *Stoltz v. Chobani LLC,* No. 1:14-cv-03827 (E.D.N.Y., filed June 19, 2014); *Stoltz v. Fage Dairy Processing SA*, No. 1:14-cv-03826 (E.D.N.Y., filed June 19, 2014).

60   Laura's Wholesome Junk Food, The Company, www.lauraswholesomejunkfood.com/pages/company (last visited Jan. 30, 2017).

61   *Harmon v. Cuddletime Inc. (d/b/a Laura's Wholesome Junk Food)*, No. 1622-CC-11322 (Cir. Ct., City of St. Louis, Mo., filed Nov. 16, 2016).

62   *See* Sara Donnelly, 'Junk Food' Improvement, The Portland Phoenix, May 12, 2010.

63   Laura's Wholesome Junk Food, The Company, www.lauraswholesomejunkfood.com/pages/company (last visited Jan. 30, 2017).

64   *See* Isn't Evaporated Cane Juice Just Regular Sugar?, YouTube, *at* https://www.youtube.com/watch?v=6My1ELAnIJk (last visited Jan. 30, 2017).

65   *Allen v. Taos Mountain Energy Foods LLC*, No. 1622-CC11308 (Cir. Ct., City of St. Louis, Mo., filed Nov. 16, 2016).

66   *See* Taos Mountain Energy Foods Brings Jobs to Questa, Los Alamos National Laboratory Community Connections, July 1, 2015; Taos Mountain Energy Bars Announces Major Expansion: Espanola's Food Hub Plays Major Role, Daily Post (N.M.), Apr. 21, 2015; Mike English, Taos Mountain Energy Bars to Expand Operations at Questa Facility, Albuquerque Business First, Apr. 21, 2015.

67   *Allen v. EN-R-G Foods LLC*, No. 1622-CC11306 (Cir. Ct., City of St. Louis, Mo., filed Nov. 16, 2016).

67   *See* Chris Meehan, Honey Stinger, CompanyWeek, Jan. 3, 2016.

69   *See* Scott Franz, Big Agnes, Honey Stinger Secure New Headquarters in Steamboat Springs, Steamboat Today, Sept. 6, 2016.

70   *See Schott v. Lenny & Larry's Inc.*, No. 15-21402CA01 (Fla. Cir. Ct., Miami-Dade County, filed Sept. 17, 2015).

71   *Id.*; *see also* Monica Pais, Class Says Cookie Maker Lies About Its Foods, Courthouse News Service, Oct. 6, 2015.

72   Ryan Ritchie, Adventures in Veganism: Lenny & Larry's The Complete Cookie, LA Weekly, Mar. 11, 2013; *see also* Rebekah Schouten, Q&A: Protein Cookie Company on the Cutting Edge, Food Business News, June 22, 2015.

73   Plaintiffs' lawyers have filed class actions targeting other products, such as cosmetics and household cleaners, marketed as natural. These lawsuits are not included in the case tallies presented in this report.

74   *See* FDA, Statement of Policy: Foods Derived from New Plant Varieties, 57 Fed. Reg. 22984 (May 29, 1992); FDA, Guidance for Industry Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering; Draft Guidance (Jan. 2001).

75   *See Simply Orange Orange Juice Marketing and Sales Prac. Litig.*, MDL-2361 (W.D. Mo.) (MDL established June 11, 2012); *Tropicana Orange Juice Marketing and Sales Prac. Litig.*, MDL-2353 (D. N.J.) (MDL established June 11, 2012).

76   *See, e.g.*, Defendant Pinnacle Foods Group, LLC's Notice of Motion and Motion to Dismiss Plaintiff's Complaint, *Clardy v. Pinnacle Food Groups, Inc.*, No. 3:16-cv-04385 (N.D. Cal. filed Oct. 4, 2016).

77   *See* Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2302 (Jan. 6, 1993); Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms, 56 Fed. Reg. 60,421, 60,466-67 (Nov. 27, 1991); Food Labeling, 54 Fed Reg. 32,610 (Aug. 8, 1989); *see also* Termination of Proposed Trade Regulation; Rule of Food Advertising 48 Fed. Reg. 23,270, 23,271 (May 24, 1983) (in which the Federal Trade Commission abandoned an attempt to define "natural" foods).

78   Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2,302, 2,407 (Jan. 6, 1993).

79   *See, e.g., In re Gen. Mills, Inc. Kix Cereal Litig.*, No. 12-249(KM), 2013 WL 5943972, at *1 (D. N.J. Nov. 1, 2013) (administratively terminating case); *Barnes v. Campbell Soup Co.*, No. C 12-05185 JSW, 2013 WL 5530017, at *8-9 (N.D. Cal. July 25, 2013) (staying litigation for six-months); *Cox v. Gruma Corp.*, No. 12-cv-6502 YGR, 2013 WL 3828800, at *2 (N.D. Cal. July 11, 2013) (staying litigation for six-months); *see also Astiana v. Hain Celestial Group, Inc.*, 905 F. Supp. 2d 1013, 1016-17 (N.D. Cal. 2012) (declining to make an independent determination on whether a manufacturer's use of "natural" on cosmetic labels was false or misleading in absence of FDA rules, regulations, or informal policy guidance on the issue).

80   Letter from Leslie Kux, Assistant Comm'r for Policy, U.S. Food & Drug Admin., to Hon. Yvonne Gonzalez Rogers, Hon. Jeffrey S. White, and Hon. Kevin McNulty (Jan. 6, 2014).

81   *Id.*

82   See FDA Request for Comments re the "Use of the Term 'Natural' in the Labeling of Human Food Products," Dkt. FDA-2014-N-1207, 80 Fed. Reg. 69,905 (Nov. 12, 2015).

83   *Kane v. Chobani, LLC*, 645 Fed.Appx. 593 (9th Cir. 2016).

84   *See, e.g., Maxwell v. Unilever United States, Inc.*, No. 5:12-CV-01736, 2016 WL 5110498, at *1 (N.D. Cal. Mar. 30, 2016); *Mains v. Whole Foods Market, Inc.*, No. 12-cv-5652, 2016 WL 5791414 at 3 n.2 (N.D. Cal. Apr. 18, 2016); *In re Hain Celestial Seasonings Products Consumer Litig.*, No. 8:13-cv-1757, 2016 WL 6302513 (C.D. Cal. May 10, 2016); *Viggiano v. Johnson & Johnson*, 2016 WL 5110500, at *2-3 (C.D. Cal. June 21, 2016); *see also Anderson v. The Hain Celestial Grp.*, No. 14-cv-03895, Dkt. 62 (N.D. Cal. Apr. 8, 2016) (stayed by stipulation).

85    *See, e.g., Forsher v. J.M. Smucker Co.*, No. CV 2015-7180, 2016 WL 5678567, at *1-2 (E.D.N.Y. Sept. 30, 2016); *In re KIND LLC Healthy & Nat. Litig.*, 2016 WL 4991471, at *6 (S.D.N.Y. Sept. 15, 2016).

86    *See, e.g., In re Gen. Mills, Inc. Kix Cereal Litig.*, 2016 WL 5110499, at *1 (D. N.J. June 13, 2016).

87    *See, e.g., Thornton v. Pinnacle Foods Grp.*, LLC, No. 4:16-cv-00158, 2016 WL 5793193, at *2 (E.D. Mo. Sept. 30, 2016); *George v. Blue Diamond Growers*, 2016 WL 1464644, at *3 (E.D. Mo. Apr. 14, 2016).

88    *See* Elaine Watson, Whole Foods Targeted in New Lawsuit Over 'All-Natural' Claims, Food Navigator, July 25, 2014 (observing that "large firms [are] starting to quietly remove 'all-natural' from packaging").

89    Washington Legal Found., Evaporated Cane Juice Litigation (as of Jan. 22, 2014), https://wlflegalpulse.files.wordpress.com/2014/03/evaporated-cane-juice-cases-2-as-of-1-22-2014.pdf (last visited Jan. 30, 2017).

90    FDA, Ingredients Declared as Evaporated Cane Juice: Guidance for Industry (May 2016).

91    *See, e.g.,* Order Granting Motion to Dismiss in Party and Staying Case, *Reese v. Odwalla, Inc.*, No. 13-cv-947 (N.D. Cal. Mar. 24, 2014).

92    *See* Elaine Watson, 'Evaporated Cane Juice' Should Be Declared as 'Sugar' Says FDA; Get Ready for the Lawsuits, Say Attorneys, Food Navigator, May 25, 2016 (quoting Justin Prochnow, a shareholder at Greenberg Traurig).

93    *See, e.g., Kazemi v. Dave's Gourmet, Inc.*, No. 16-cv-5269 (N.D. Cal. filed Sept. 14, 2016) (pasta sauces); *Villagomez v. Free to Eat Inc.*, No. 37-2016-28908 (San Diego County Super. Ct., Cal., filed Aug. 8, 2016) (cookies); *O'Neal v. Natural & Tasty LLC,* No. RIC-1611717 (Riverside County Super. Ct., Cal., filed Sept. 12, 2016) (dessert); *Garcia v. Rebbl Inc.*, No. 00876919CXC (Orange County Super. Ct., Cal., Sept. 20, 2016) (drinks); *Benson v. Wheat Montana Farms, Inc.*, No. RIC1611718 (Riverside County Super Ct., Cal., filed Sept. 12, 2016) (pancake mix).

94    The Armstrong Law Firm filed the following cases in the St. Louis City Circuit Court: *Grindel v. Mondelez Int'l Inc.*, No. 1622-CC11518 (filed Nov. 16, 2016); *Harmon v. Cuddletime Inc.*, No. 1622-CC-11322 (filed Nov. 16, 2016); *Callahan v. Garden of Light Inc.*, No. 1622-CC11313 (filed Nov. 15, 2016); *Allen v. Taos Mountain Energy Foods LLC*, No. 1622-CC11308 (filed Nov. 15, 2016); *Collier v. Love Grown Foods LLC*, No. 1622-CC11307 (filed Nov. 15, 2016); *Allen v. EN-R-G Foods LLC*, No. 1622-CC11306 (filed Nov. 15, 2016); *Bryant v. BB Holdings Inc.*, No. 1622-CC11280 (filed Nov. 14, 2016); *Blair v. Eco Heaven LLC*, No. 1622-CC11279 (filed Nov. 14, 2016); *Johnson v. Dave's Gourmet Inc.*, No. 1622-CC11276 (filed Nov. 14, 2016); *Blair v. Inventure Foods Inc.*, No. 1622-CC11275 (filed Nov. 14, 2016); *Thornton v. Red Mill Farms LLC*, No. 1622-CC11274 (filed Nov. 14, 2016); *McNamee v. Edward & Sons Trading Co.*, No. 1622-CC11261 (filed Nov. 10, 2016).

95    For example, a surge of lawsuits target products that contain citric acid, alleging that the inclusion of this ingredient makes the product no longer preservative free. *See, e.g., Ross v. Nestle USA Inc.*, No. 1:16-cv-9563 (S.D.N.Y. filed Dec. 12, 2016) (frozen dinners); *Haack v. Drew's LLC*, No.7:16-cv-6022 (S.D.N.Y. filed July 28, 2016) (salad dressings); *Hu v. Herr's Foods Inc.*, No. 1:16-cv-03313 (E.D.N.Y. filed June 20, 2016) (packaged snack foods); *Hu v. Golden Orchid Ltd.*, No. 1:16-cv-02234 (E.D.N.Y. filed May 4, 2016) (jarred cucumbers and radishes); *Daniels v. Izze Beverage Co.*, No. 4:16-cv-01851(N.D. Cal. filed Apr. 8, 2016) (carbonated juice products); *Chen v. Outernational Brands Inc.*, No. 1:16-cv-1634 (E.D.N.Y. filed Apr. 4, 2016) (aloe vera drinks); *Shmidt v. Victoria Fine Foods LLC*, No. 1:16-cv-230 (E.D.N.Y. filed Jan. 15, 2016) (vodka); *Riedel v. Lucini Italia Co.*, No. 1:16-cv-169 (E.D.N.Y. filed Jan. 13, 2016) (Italian foods); *Cruz-Acevedo v. ConAgra Foods Inc.*, No. 3:15-cv-02307 (D. P.R. filed Sept. 20, 2015) (Chef Boyardee products). Food makers counter that citric acid is used to provide flavoring, it derives from natural substances, and its common presence is disclosed among the product's ingredients.

96   Debra Cassens Weiss, Suit Claims Plaintiff Shocked to Learn Nutella Was 'Next Best Thing to a Candy Bar,' ABA J., Feb. 3, 2011 (quoting complaint).

97   *See* Ted Burnham, Nutella Maker May Settle Deceptive Ad Lawsuit for $3 Million, NPR, Apr. 26, 2012 (including video of Nutella television advertisement).

98   *Id.*

99   Laurent Belsie, Nutella Settles Lawsuit. You Can Get $20, Christian Sci. Monitor, Apr. 27, 2012 (including transcript of television ad).

100  *See Savalli v. Gerber Prods. Co.*, No. 15-cv-61554, 2016 WL 5390223, at *1 (S.D. Fla. Sept. 20, 2016); *see also Henry v. Gerber Prods. Co.*, No. 15-cv-02201, 2016 WL 158990 (D. Or. Apr. 18, 2016).

101  *Workman v. Plum Inc.*, 141 F. Supp.3d 1032, 1035 (N.D. Cal. 2015).

102  *Id.*

103  *Id.*

104  *Lipkind v. PepsiCo. Inc.*, No. 1:16-cv-05506 (E.D.N.Y. filed Oct. 4, 2016).

105  Julia A. Steinberg, PepsiCo's 'Naked' Drinks Deceptively Marketed, Suit Says, Bloomberg BNA Class Action Litig. Rep., Oct. 4, 2016 (quoting PepsiCo statement).

106  Complaint, *Saidian v. Krispy Kreme Doughnuts, Inc.*, No. 2:16-cv-08338, at 9 (C.D. Cal. filed Nov. 9, 2016).

107  *Id.* at 10.

108  *See* KIND LLC, Citizen Petition, Docket No. FDA-2015-P-4566, Dec. 1, 2015; *see also* Coral Beach, FDA Allows More Time for Comments on 'Healthy' Food Labels, Food Safety News, Jan. 6, 2017.

109  *See* Use of the Term ''Healthy'' in the Labeling of Human Food Products; Request for Information and Comments; Extension of Comment Period, 81 Fed. Reg. 96,404 (Dec. 30, 2016).

110  A lawsuit alleged that Mondelez International falsely marketed Sour Patch Watermelon Candy when the label stated that the box contains 28 pieces of candy, but the box could hold at least 50 pieces, leaving approximately 44% of the candy box empty. The district court found that the plaintiff could claim deception, despite an accurate net weight and precise candy count on the label. It dismissed the lawsuit, however, because the plaintiff failed to sufficiently allege that the he paid more money that the product was worth as a result of the deception. *See* Memorandum Decision and Order Granting Defendants' Motion to Dismiss and Denying Defendants' Motion to Strike, *Izquierdo v. Mondelez Int'l, Inc.*, No. 16-cv-4697 (S.D.N.Y. Oct. 26, 2016).

111  *See* Julie A. Steinberg, McCormick Pepper, Advil, Starbucks: 'Slack Fill' Suits Grow, Bloomberg BNA Prod. Safety & Liab. Reporter, Oct. 25, 2016 (citing Bonnie Patten, executive director of Truthinadvertising.org, a consumer watchdog group).

112  *See* James P. Muehlberger & Iain L. Kennedy, The Glass Half-Empty Class Action: Slack-Fill Litigation, Law360, Aug. 3, 2015.

113  *See* 21 C.F.R. § 100.100.

114  *See* Cal. Bus. & Prof. Code § 12606.2; Cal. Health & Safety Code § 110375.

115  *See Bush v. Mondelez Int'l,* Inc., No. 16-cv-02460, 2016 WL 5886886, at *1 (N.D. Cal. Oct. 7, 2016) (quoting complaint).

116  *Id.* at *3 (*quoting Ebner v. Fresh, Inc.*, No. 13-56644, 2016 WL 5389307, at *6 (9th Cir. Sept. 27, 2016)).

117  *Id.*

118  Memorandum and Order, *Fermin v. Pfizer, Inc.*, No. 15-cv-2016 (E.D.N.Y. Oct. 18, 2016).

119  *Id.* at 4-5.

120  *Id.* at 5.

121   *See* Complaint, *Wurtzburger v. Kentucky Fried Chicken*, No. 1:16-cv-08186 (S.D.N.Y.) (filed Sept. 29, 2016 and removed to federal court from the Supreme Court of the State of New York, Dutchess County).

122   Kathianne Boniello, 'Where's the Chicken?': Woman Sues KFC for $20M Over False Advertising, N.Y. Post, Oct. 22, 2016; NY Woman Suing KFC For $20 Million Over $20 Chicken Bucket Ad, CBS News, Oct. 23, 2016.

123   Order Granting Final Approval of Settlement; Granting in Part and Denying in Part Motion for Attorneys' Fees, *Hendricks v. Starkist Co.*, No. 13-cv-00729-HSG (N.D. Cal. Sept. 29, 2016).

124   *See In re Trader Joes Tuna Litig.*, No. 2:16-cv-01371 (C.D. Cal.) (consolidation of four class actions filed in California, Illinois, and New York); *Soto v. Safeway Inc.*, No. 3:15-cv-05078 (N.D. Cal. filed Nov. 5, 2015, dismissed July 14, 2016); *Shiner v. Safeway Inc.*, No. 3:16-cv-00318 (N.D. Cal. filed Jan. 20, 2016); *Shihad v. Safeway Inc.*, No. 3:16-cv-00114 (N.D. Cal. filed Jan. 8, 2016); *Shihad v. Wild Planet Foods, Inc.*, No. 1:16-cv-1478 (N.D. Cal. filed Mar. 25, 2016).

125   *See Pincus v. Starbucks Corp.*, No. 1:16-cv-4705 (N.D. Ill. filed Apr. 27, 2016); *Forouzesh v. Starbucks Corp.*, No. 2:16-cv-3830 (C.D. Cal. filed June 1, 2016).

126   *See Crittenden v. Starbucks Corp.*, No. 1:16-03496 (S.D.N.Y. filed May 1, 2016); *Strumlauf v. Starbucks Corp.*, No. 3:16-cv-1306 (N.D. Cal. filed Mar. 16, 2016).

127   Civil Minutes, *Forouzesh v. Starbucks Corp.*, No. 2:16-cv-3830, at 3 (C.D. Cal. Aug. 19, 2016).

128   *See* Memorandum Opinion and Order, *Galanis v. Starbucks Corp.*, No. 16-cv-4705, at 7 (N.D. Ill. Oct. 14, 2016).

129   *See* Order Granting in Part and Denying in Part Defendant's Motions to Dismiss, *Strumlauf v. Starbucks Corp.*, No. 16-cv-01306 (N.D. Cal. June 17, 2016).

130   *See* Stipulation and Order Regarding the Filing of First Amended Class Action Complaint, *Strumlauf v. Starbucks Corp.*, No. 16-cv-01306 (N.D. Cal. Sept. 20, 2016).

131   *See* Lydia Mulvany, The Parmesan Cheese You Sprinkle on Your Penne Could Be Wood, Bloomberg, Feb. 16, 2016 (citing Dean Sommer, a cheese technologist at the Center for Dairy Research in Madison, Wisconsin).

132   *In re: 100% Grated Parmesan Cheese Mktg. and Sales Practices Litig.*, __ F. Supp. 3d __, 2016 WL 3190426 (J.P.M.L. June 2, 2016).

133   *See* Christine A. Scheuneman & Elaine Y. Lee, Courts Are Distilling the Essence of 'Handmade' Spirits Claims, Law360, June 22, 2015.

134   Order of Dismissal, *Salters v. Beam Suntory Inc.*, No. 4:14-cv-00659, 2015 WL 2124939 (N.D. Fla. May 1, 2015).

135   *Id.*

136   *Id.* In 2015, two judges in the Southern District of California dismissed similar claims targeting Maker's Mark and Jim Beam. As Judge Larry A. Burns observed, "[m]achines, including stills and other equipment, have always been necessary to make bourbon." Order of Dismissal, *Welk v. Beam Suntory Import Co.*, No. 15-cv-328-LAB (S.D. Cal. Aug. 21, 2015); *Nowrouzi v. Maker's Mark Distillery, Inc.*, 2015 WL 4523551, at *4-5 (S.D. Cal. July 27, 2015).

137   *See* Order Granting Summary Judgment, *Pye v. Fifth Generation, Inc.*, No. 4:14-cv-00493 (N.D. Fla. Sept. 27, 2016). Some claims against the maker of Tito's "Handmade" vodka withstood motions to dismiss and for summary judgment, but were eventually dismissed by the parties. *See, e.g., Hofmann v. Fifth Generation Inc.*, No. 3:14-cv-02569 (S.D. Cal.) (dismissed on joint motion May 3, 2016); *Cabrera v. Fifth Generation Inc.*, No. 3:14-cv-02990 (S.D. Cal.) (same); *see also* Steven Trader, Vodka Drinkers Seek Cert. in Tito's 'Handmade' False Ad Suits, Law360, Jan. 11, 2016 (discussing *Hofmann* and *Cabrera* cases). Similar lawsuits remain pending. *See, e.g.,* Memorandum Decision and Order, *Singleton*

*v. Fifth Generation Inc.*, No. 5:15-cv-00474 (N.D.N.Y. Jan. 12, 2016) (dismissing claims for breach of express warranty and negligent misrepresentation, but denying dismissal of other claims).

138  *See* Order Granting Defendant MillerCoors LLC's Motion to Dismiss Plaintiff's First Amended Complaint, *Parent v. MillerCoors LLC*, No. 3:15-cv-1204-GPC-WVG (S.D. Cal. June 16, 2016).

139  *Vazquez v. Anheuser-Busch Cos. LLC*, No. 1:16-cv-21181 (S.D. Fla. filed Apr. 1, 2016).

140  Kat Sieniuc, Anheuser Can't Escape 'Abbey Ale' Suit, Consumer Says, Law360, Sept. 16, 2016.

141  Dan Bobkoff & Bill Chappell, Budweiser May Seem Watery, But It Tests at Full Strength, Lab Says, NPR, Feb. 27, 2013 (quoting Josh Boxer, lead attorney for the plaintiffs).

142  *See id.*

143  *See* Lee Moran, Anheuser-Busch Responds to 'Watered Down' Budweiser Lawsuit with Funny Ad Campaign, N.Y. Daily News, Mar. 4, 2014; Adam Taylor, Anheuser-Busch Launches Campaign to Fight Watered-Down Beer Accusations, Business Insider, Mar. 3, 2013.

144  *See* Memorandum Opinion and Order, *In re Anheuser-Busch Beer Labeling Marketing & Sales Practices Litig.*, No. 1:13 MD 2448, at 31 (N.D. Ohio June 2, 2014); *see also* Lisa Brown, Judge Dismisses Lawsuits Alleging A-B Waters Down Beer, St. Louis Post-Dispatch, June 3, 2014.

145  *In re Anheuser-Busch Beer Labeling Mktg. & Sales Practices Litig.*, 644 Fed. App'x 515, 527 (6th Cir. 2016) (citing 27 C.F.R. § 7.71(c)).

146  21 C.F.R. § 101.9(c)(2)(ii) ("If the serving contains less than 0.5 grams [of trans-fat], the content, when declared, *shall* be expressed as zero.") (emphasis added).

147  *See* FDA, Tentative Determination Regarding Partially Hydrogenated Oils, 78 Fed. Reg. 67,169 (Nov. 8, 2013).

148  *See* FDA, Final Determination Regarding Partially Hydrogenated Oils, 80 Fed. Reg. 34,650 (June 17, 2015).

149  Greg G. Lammi, FDA's Next Gift to the Litigation Industry: A Veritable Ban on Partially Hydrogenated Oils?, Forbes (Wash. Legal Found., Mar. 20, 2015).

150  Helen Bottemiller Evich, It's Official: Obama Axes Trans Fat, Politico, June 16, 2015 (quoting Stefanie Fogel, partner and co-chair of the food and beverage practice at DLA Piper).

151  *Id.*

152  Complaint, *Backus v. H.J. Heinz*, No. 3:15-cv-02738, at 15 (N.D. Cal. filed June 18, 2015).

153  *See, e.g.*, Order Granting Defendant Nestle USA's Motion to Dismiss First Amended Complaint, *Backus v. Nestle USA Inc.*, No. C-15-1963, at 6-7 (N.D. Cal. Mar. 9, 2016).

154  Order Granting Defendant's Motion to Dismiss, *Guttmann v. Nissin Foods (U.S.A.) Co.*, No. 3:15-cv-567, at 5 (N.D. Cal. Aug. 14, 2015).

155  *Id.*

156  *See, e.g.*, *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 475 Fed. App'x 113, 115 (9th Cir. 2012) (memorandum disposition); *Backus v. Nestle USA Inc.*, 167 F. Supp. 3d 1068, 1074-75 (N.D. Cal. 2016); *Walker v. B&G Foods, Inc.*, No. 15-cv-03772, 2016 WL 463253, at *4 (N.D. Cal. Feb. 8, 2016); *Guttman v. Nissin Foods (U.S.A.) Co.*, No. 15-cv-00567, 2015 WL 4309427, at *3 (N.D. Cal. July 15, 2015); *Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1121 (N.D. Cal. 2010).

157  *Walker v. B&G Foods, Inc.*, 2016 WL 463253, at *6 (quoting 80 Fed. Reg. 34650, 34651); *see also Backus v. General Mills, Inc.*, 122 F. Supp. 3d 909, 933 (N.D. Cal. Aug. 18, 2015).

158  *See* Order Granting Defendant's Motion to Dismiss, *Hawkins v. Kellogg Co.*, No. 16-cv-0147 (S.D. Cal. Dec. 13, 2016) (relying on Consolidated Appropriations Act of 2016, Pub. L. No. 114-113, § 754, 129 Stat. 2242, 2284 (2015)); *Backus v. Nestle USA, Inc.*, 167

F. Supp. 3d 1068, 1073-74 (N.D. Cal. 2016) (same); *Backus v. ConAgra Foods, Inc.*, No. 16-cv-0454, 2016 WL 3844331, at *3-4 (N.D. Cal. July 15, 2016).

159   *Hawkins v. Kellogg Co.*, slip op., at 16.

160   *See, e.g.*, Order Denying Motion to Dismiss, *Backus v. ConAgra Foods, Inc.*, No. C-00454 WHA (N.D. Cal. Oct. 3, 2016) (finding plaintiff had standing to allege he was misled by margarine marketed as "maintaining a healthy lifestyle" when it includes trans fat).

161   *See* Cal. Health & Safety Code § 25249.5 et seq.

162   *Tye v. Wal-Mart Stores, Inc.*, Complaint at 4, No. 8:15-cv-01615-DOC-JCG (C.D. Cal. filed Oct. 7, 2015).

163   Motion to Dismiss, *Tye v. Wal-Mart Stores, Inc.*, No. 8:15-cv-01615-DOC-JCG, Dkt. 29, at 1-2 (C.D. Cal. Jan. 27, 2016).

164   Order on Motion to Dismiss, Dkt. 41, at 6 n.2, No. 8:15-cv-01615-DOC-JCG (C.D. Cal. Jan. 27, 2016).

165   *Fonseca v. Vigo Importing Co.*, No. 5:16-cv-02055 (N.D. Cal. filed Apr. 19, 2016).

166   *Cooper v. The Quaker Oats Co.*, No. 3:16-cv-02364-LV (N.D. Cal. Apr. 29, 2016) (transferred to N.D. Ill. for coordinated proceedings with three similar class actions from other jurisdictions).

167   Emily Field, Quaker Oats Contains Possible Carcinogen, Suit Says, Law360, May 2, 2016 (quoting Quaker Oats spokesperson).

168   *Charles v. The Wine Group, Inc.*, Complaint at 3, No. BC576061 (Cal. Super. Ct., Mar. 19, 2015).

169   *See, e.g., Hackman v. Kraft Heinz Food Co.*, Complaint at 15, No. 2:16-cv-00328-MRH (W.D. Pa. Mar. 18, 2016).

170   *Slomski v. The Hain Celestial Group, Inc.*, Complaint at 3-9, No. 8:13-cv-01757 (C.D. Cal. Nov. 6, 2013).

171   *In re 100% Grated Parmesan Cheese Marketing and Sales Practices Litig.*, MDL Nos. 2705, 2707, 2708, 2016 WL 3190426, at * 1 (J.P.M.L. June 2, 2016).

172   Lydia Mulvany, The Parmesan Cheese You Sprinkle on Your Penne Could Be Wood, Bloomberg News, Feb. 17, 2016.

173   *Id.* (quoting Blaire Kniffin, a Whole Foods Market Inc. spokeswoman).

174   *In re Whole Foods Market, Inc.*, No. A-14-MC-2588-SS, MDL. No. 2588, at ¶¶ 30-31 (W.D. Tex. Feb. 12, 2016).

175   Order, *In re Whole Foods Market, Inc.*, No. A-14-MC-2588-SS, MDL. No. 2588, at 11-15 (W.D. Tex. Feb. 16, 2016). Litigation has continued, however, over whether Whole Foods improperly disposed of the yogurt, precluding further testing, after the court dismissed the complaint. *See* Shayna Posses, Whole Foods Says It's Time to Trash Sugary Yogurt MDL, Law360, Sept. 2, 2016.

176   *See* Julie A. Steinberg, Sugar Suits: The Next Tobacco?, BNA Class Action Litig. Rep., Sept. 23, 2016.

177   *See* Complaint, *Truxel v. General Mills Sales, Inc.*, No. 3:16-cv-0957, at 1 (N.D. Cal. filed Aug. 29, 2016); Complaint, *Hadley v. Kellogg Sales Co.*, No. 5:16-cv-04955, at 1 (N.D. Cal. filed Aug. 29, 2016); Complaint, *Krommenhock v. Post Foods LLC*, No. 3:16-cv-04958, at 1 (N.D. Cal. filed Aug. 29, 2016).

178   *See id.*

179   *See Truxel v. General Mills Sales, Inc.*, Complaint at 90-95, No. 3:16-cv-0957 (N.D. Cal. filed Aug. 29, 2016).

180   *Id.* at 158.

181   *See Amaya v. Dole Packaged Foods, LLC*, No. 2:15-cv-7734 (C.D. Cal. filed Oct. 18, 2016).

182   *See, e.g., Videtto v. Kellogg USA*, 2009 WL 1439086 (E.D. Cal. 2009; *McKinnis v. Kellogg USA*, 2007 WL 4766060 (C.D. Cal. Sept. 19, 2007).

183  See Amended Order Granting Motion to Dismiss, *Werberl v. Pepsico, Inc.*, No. 4:09-cv-04456, 2010 WL 2673860 (N.D. Cal. July 2, 2010); Sugawara v. Pepsico, Inc., No. 08-cv-1335, 2009 WL 1439115 (E.D. Cal. May 21, 2009).

184  *The Praxis Project v. Coca-Cola Co.*, No. 4:17-cv-00016 (N.D. Cal. filed Jan. 4, 2017).

185  The action was brought on behalf of an advocacy group, The Praxis Project, by lawyers for the Center for Science and the Public Interest, Reese LLP, and The Public Health Advocacy Institute.

186  *See id.* (observing "California courts . . . have recognized that whether a business practice is deceptive will usually be a question of fact not appropriate for decision on demurrer" and reversing district court's dismissal of food class action).

187  *Sugawara v. Pepsico, Inc.*, No. 08-cv-1335, 2009 WL 1439115 (E.D. Cal. May 21, 2009).

188  *Rooney v. Cumberland Packing Corp.*, No. 12-CV-0033-H DHB, 2012 WL 1512106 (S.D. Cal. Apr. 16, 2012).

189  *Pelayo v. Nestle USA, Inc.*, 989 F. Supp.2d 973, 978 (C.D. Cal. 2013) (quoting opposition).

190  *Ang v. Whitewave Foods Co.*, No. 13-CV-1953, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013).

191  *Workman v. Plum Inc.*, 141 F. Supp.3d 1032, 1035 (N.D. Cal. 2015) (internal quotation omitted).

192  *Salters v. Beam Suntory, Inc.*, No. 4:14CV659-RH/CAS, 2015 WL 2124939, at *2 (N.D. Fla. May 1, 2015).

193  *Kelly v. Cape Cod Potato Chip Co.*, 81 F. Supp.3d 754, 760 (W.D. Mo. 2015) (internal citation and quotations omitted).

194  *Forouzesh v. Starbucks Corp.*, No. 2:16-cv-03830, 2016 WL 4443203, at *3 (C.D. Cal. Aug. 19, 2016).

195  *See* Order Granting Motion to Dismiss, *Bush v. Mondelez Int'l, Inc.*, No. 16-cv-02460, at 6 (N.D. Cal. Oct. 7, 2016) (quoting complaint).

196  *Savalli v. Gerber Prods. Co.*, No. 15-cv-61554, 2016 WL 5390223, at *1 (S.D. Fla. Sept. 20, 2016).

197  *See Kane v. Chobani, LLC*, 645 Fed. Appx. 593 (9th Cir. 2016).

198  *See Kane v. Chobani, Inc.*, 973 F. Supp.2d 1120 (N.D. Cal. 2014).

199  *See generally* Cary Silverman, I'll See You in the Agency! 'Primary Jurisdiction' Gains Ground As a Defense for Regulated Industries, 31 LJN Prod. Liab. Law & Strategy, no. 11 (May 2013).

200  *Kane v. Chobani, Inc.*, 973 F. Supp.2d 1120, 1124 (N.D. Cal. 2014).

201  *Kane v. Chobani, Inc.*, 645 Fed. Appx. at 594.

202  *Ebner v. Fresh, Inc.*, No. 13-56644, 2016 WL 5389307 (9th Cir. Mar. 17, 2016).

203  *Id.* at *6.

204  *See id.*

205  *See, e.g., Bush v. Mondelez Int'l, Inc.*, No. 16-cv-02460, 2016 WL 5886886, at *3 (N.D. Cal. Oct. 7, 2016).

206  *See* Rick L. Shackelford & Daniell K. Newman, Why Food Companies May See More Slack-Fill Class Actions, Law 360, Apr. 12, 2016.

207  *See Brazil v. Dole Packaged Foods, Inc.*, No. 14-17480, 2016 WL 5539863 (9th Cir. Sept. 30, 2016) (unpublished).

208  *Id.* at *1 (quoting Food & Drug Admin., Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993)).

209  *See id.*

210  *See id.* at *2

211   *See id.* at *1.

212   *See* Julie A. Steinberg, Dole 'All Natural' Ruling Draws Mixed Reviews, Bloomberg BNA Prod. Safety & Liab. Reporter, Oct. 10, 2016.

213   *Brazil*, 2016 WL 5539863, at *2 ("[A] plaintiff cannot be awarded a full refund unless the product she purchased was worthless.").

214   *See id.* at *3.

215   *See id.*

216   *See, e.g.*, Julie A. Steinberg, Consumers: ConAgra Ruling Big Boon for Other Fraud Cases, Bloomberg BNA: Prod. Safety & Liab. Reporter, Jan. 5. 2017 (reporting comments of plaintiffs' attorneys at the Millberg LLP, Blood Hurst & O'Reardon, LLP, and Stanley Law Group).

217   *See Briseno v. ConAgra Foods Inc.*, No. 15-55727 (9th Cir.).

218   Cara Bayles, 9th Circ. Skeptical of ConAgra's GMO False Ad Decert. Bid, Law360, Sept. 12, 2016.

219   *See* Caroline Simson, 11 Statewide Classes OK'd In ConAgra '100% Natural' Oil Row, Law360, Feb. 24, 2015.

220   *Briseno v. ConAgra Foods Inc.*, 844 F.3d 1121 (9th Cir. 2017).

221   *Id.* (quoting Rule 23(b)(3)(D).

222   *See Carrera v. Bayer Corp.*, 727 F.3d 300 (3d Cir. 2013).

223   *See Jones v. ConAgra Foods, Inc.*, No. C 12-01633 CRB, 2014 WL 2702726, at *1-2 (N.D. Cal. June 13, 2014).

224   *See id.* at *10.

225   *See id.* at *11.

226   *See Jones v. ConAgra Foods, Inc.*, No. 14-16327 (9th Cir. July 12, 2016) (stay pending Supreme Court resolution of *Microsoft Corp. v. Baker*, No. 15-457).

227   *Bruton v. Gerber Prod. Co.*, No. 12-CV-02412-LHK, 2014 WL 2860995, at *2, *4 (N.D. Cal. June 23, 2014).

228   *See id.* at *6-7.

229   *See Bruton v. Gerber Prods. Co.*, No. 15-15174 (9th Cir. Dec. 20, 2016).

230   *In re Modafinil Antitrust Litig.*, No. 15-3475, 2016 WL 4757793, at *6 (3d Cir. Sept. 13, 2016) (citing *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 162 (3d Cir. 2001)).

231   *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 350 (2011); *see also Coopers & Lybrand v. Livesay*, 437 U.S. 463, 476 (1978) ("Certification of a large class may so increase the defendant's potential damages liability and litigation costs that he may find it economically prudent to settle and to abandon a meritorious defense."); *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 740 (1975) (recognizing that class certification gives a case "settlement value to the plaintiff out of any proportion to the prospect of success at trial").

232   *See* Mayer Brown LLP, Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions 1-2 (U.S. Chamber Inst. for Legal Reform, Dec. 2013).

233   *See* Assoc. Press, Men Sue Subway Over Too-Short Footlong After Aussie Teen Matt Corby's Photo Ignites Scandal, Jan. 24, 2013.

234   *See* Kaylee Osowski, Some Subway 'Footlong' Subs Don't Measure Up, N.Y. Post, Jan. 17, 2013 (reporting the photo gained 118,000 "likes" in just 24 hours).

235   *See* Ali Watkins, Shrunken Subway Sandwich Lead to N.J. Lawsuit, Daily News, Jan. 25, 2013.

236   Transfer Order, *In re Subway Footlong Sandwich Marketing & Sales Practices Litig.*, MDL No. 2439 (J.P.M.L. June 10, 2013); Conditional Transfer Order (CTO-1), *In re Subway Footlong Sandwich Marketing & Sales Practices Litig.*, MDL No. 2439 (J.P.M.L. June 25, 2013).

237   Decision and Order, *In re Subway Footlong Sandwich Marketing & Sales Practices Litig.*, MDL No. 13-02439, at 3 (E.D. Wis. Feb. 25, 2016) (Subway Final Settlement Approval).

238   *Id.*

239   *See id.* at 4-5, 12.

240   Jonathan Stempel, Subway 'Footlong' Settlement Gets Appeals Court Grilling, Reuters, Sept. 8, 2016 (quoting Jeffrey Babbin, a lawyer for Subway); see also Bruce Vielmetti, Size Does Matter — Judge Oks Preliminary Deal on Subway Case, Journal Sentinel, Oct. 20, 2015.

241   Subway Final Settlement Approval, *supra*, at 28.

242   *Id.*

243   Jacob Gershman, Subway 'Footlong' Settlement Short on Dough, Wall St. J., Oct. 20, 2015.

244   *See* Subway Final Settlement Approval, *supra*, at 16-17 (noting objection to settlement of Theodore H. Frank of the Center for Class Action Fairness).

245   *In re Subway Footlong Sandwich Marketing & Sales Practices Litig.*, No. 16-1652 (7th Cir.).

246   *See* Jonathan Stempel, Subway 'Footlong' Settlement Gets Appeals Court Grilling, Reuters, Sept. 8, 2016.

247   *See* Stipulation of Settlement, *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal. May 14, 2015).

248   Order Granting Final Approval of Settlement; Granting in Part and Denying in Part Motion for Attorneys' Fees, *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal. Sept. 29, 2016).

249   *See* Plaintiff's Notice of Motion and Motion for an Award of Attorneys' Fees, Costs and Expenses, and Incentive Awards for the Class Representative and Interested Parties, *Hendricks v. StarKist Co.*, No. 3:13-cv-0729-HSG (N.D. Cal. Oct. 30, 2015).

250   Class Action Complaint at 2, *Careathers v. Red Bull N. Am. Inc.*, No. 1:13-cv-00369-KPF (S.D.N.Y. Jan. 16, 2013).

251   *See generally* Plaintiffs' Memorandum of Law in Support of the Joint Motion for Preliminary Approval of Class Action Settlement, *Careathers v. Red Bull N. Am. Inc.*, No. 1:13-cv-0369 (S.D.N.Y. July 14, 2014); Plaintiffs' Memorandum of Law in Support of the Joint Motion for Preliminary Approval of Class Action Settlement, *Wolf v. Red Bull GmbH*, No. 1:13-cv-08008 (KPF) (S.D.N.Y. July 14, 2014) (July 31, 2014).

252   Jacob Davidson, Thanks for Ruining the Red Bull Settlement, Internet, Money Magazine, Oct. 9, 2014.

253   Pete Brush, Red Bull for Everybody! Judge OKs $13M False Ad Settlement, Law360, May 1, 2015.

254   *See* Order for Awarding Attorneys' Fees, Expenses and Service Awards for Named Plaintiff, *Careathers v. Red Bull N. Am. Inc.*, No. 1:13-cv-0369 (S.D.N.Y. May 12, 2015).

255   Pete Brush, *supra* (quoting Jason Russell of Skadden Arps Slate Meagher & Flom LLP).

256   *See Dennis v. Kellogg Co.*, Case No. 09-CV-1786-L (WMc), 2013 WL 6055326, at *1 (S.D. Cal. Nov. 14, 2013).

257   *See* Maria Godoy, No, Frosted Mini-Wheats Won't Make Your Kids Smarter, NPR, May 30, 2013.

258   *See Dennis v. Kellogg Co.*, 687 F.3d 1149 (9th Cir. July 13, 2012), *withdrawn and superseded,* 697 F.3d 858 (9th Cir. 2012).

259   *Id.*; *see also* Maura Dolan, Kellogg Class-Action Settlement Rejected by Federal Appeals Court, L.A. Times, July 14, 2012.

260   *Dennis v. Kellogg Co.*, 697 F.3d at 869.

261   *See Dennis v. Kellogg Co.*, No. 09-CV-1786-L (WMc), 2013 WL 6055326, at *1 (S.D. Cal. Nov. 14, 2013).

262   *See* Melissa LaFreniere, Kellogg's Frosted Mini-Wheats Class Action Settlement Checks Mailed, Top Class Actions, Apr. 18, 2016.

263   *Id.* (comment posted by Burt Draper, May 7, 2016).

264   Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, *Eggnatz v. Kashi Co.*, No. 1:12-cv-21678 (S.D. Fla. June 5, 2015).

265   *See* Final Judgment and Notice of Dismissal, *Eggnatz v. Kashi Co.*, No. 1:12-cv-21678, at 4 (S.D. Fla. Feb. 1, 2016).

266   *Id.*

267   *See* Laurent Belsie, Nutella Settles Lawsuit. You Can Get $20, Christian Sci. Monitor, Apr. 27, 2012.

268   *In re: Nutella Marketing & Sales Practices Litig.*, No. 3:11-cv-01086 (D. N.J.).

269   Final Judgment and Order Approving Settlement and Dismissing Claims of Class Members with Prejudice and Granting Plaintiffs' Motion for Attorney's Fees, *In re Ferrero Litig.*, No. 3:11-cv-00205-H-KSC (S.D. Cal. July 9, 2012).

270   Lindsay Goldwert, Maker of Nutella Settles with Consumers Over 'Healthy Food' Claims; Will Pay Out $3 Million, N.Y. Daily News, Apr. 26, 2012.

271   Abby Ellin, Nutella, After Suit, Drops Health Claims, ABC News via Good Morning America, World News, Apr. 26, 2012.

272   Emily Anne Epstein, Spread the Wealth! Mum Win $3 million in Class-Action Suit Over Nutella's 'Misleading' Health Claims, Daily Mail, Apr. 27, 2012.

273   *See* Ben James, Atty Fees in $5.5 Nutella Deal Left Bad Taste, Consumers Say, Law360, June 15, 2012.

274   *See* Sindhu Sundar, $3M Nutella Settlement Goes Through After Atty Award Slashed, Law360, July 31, 2012.

275   *In re Nutella Marketing & Sales Practices Litig.*, Nos. 12-3456, 12-3457 and 12-4629 (3d Cir. Sept. 29, 2014).

276   *See In re Ferraro Litig.*, No. 12-56459 (9th Cir. July 16, 2014).

277   *See* Mayer Brown LLP, Do Class Actions Benefit Class Members? An Empirical Analysis of Class Actions 1 (U.S. Chamber Inst. for Legal Reform, Dec. 2013) (finding "[a]pproximately 14 percent of all class action cases remained pending four years after they were filed, without resolution or even a determination of whether the case could go forward on a class-wide basis").

278   *See id.* at 6.

279   *See id.* at 6-7.

280   *See id.* at 7.

281   Greg Trotter, Lawsuits Challenging Food Labels on the Rise, But Are They Good for Consumers, Chic. Trib., May 6, 2016.

282   *Id.*

283   *See* Carlton Fields, Class Action Survey: Best Practices in Reducing Cost and Managing Risk in Class Action Litigation 14 (2016)

284   *See id.* at 4, 7-8 (estimating total spending on legal service related to all class actions ay $2.1 billion in 2015, and finding 25% of this spending related to actions alleging consumer fraud).

